# United States Court of Appeals

*for the*

# Federal Circuit

ROYAL CROWN COMPANY, INC. and DR PEPPER/SEVEN UP, INC.,

*Appellants,*

– v. –

THE COCA-COLA COMPANY,

*Appellee.*

APPEAL FROM THE TRADEMARK TRIAL AND APPEAL BOARD OF THE
UNITED STATES PATENT AND TRADEMARK OFFICE IN OPPOSITION NOS.
91178927, 91180771, 91180772, 91183482, 91185755, 91186579, 91190658

## NON-CONFIDENTIAL BRIEF FOR APPELLANTS

LAURA POPP-ROSENBERG
BARBARA SOLOMON
EMILY WEISS
FROSS, ZELNICK, LEHRMAN
   & ZISSU, PC
866 United Nations Plaza
New York, New York 10017
(212) 813-5900

*Attorneys for Appellants*

November 17, 2016

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Royal Crown Company, Inc.     **v.**     The Coca Cola Company

Case No.     16-2375

## CERTIFICATE OF INTEREST

Counsel for the:

☐ (petitioner) ☒ (appellant) ☐ (respondent) ☐ (appellee) ☐ (amicus) ☐ (name of party)

certifies the following (use "None" if applicable; use extra sheets if necessary):

| 1. Full Name of Party Represented by me | 2. Name of Real Party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me is: | 3. Parent corporations and publicly held companies that own 10 % or more of stock in the party |
|---|---|---|
| Royal Crown Company, Inc. | NONE | Snapple Beverage Corp. |
| Dr Pepper/Seven Up, Inc. | | DPS Holdings Inc. |
| | | DPS Americas Beverages, LLC |
| | | Dr Pepper Snapple Group, Inc. |
| | | DP Beverages Inc. |
| | | |
| | | |

4.   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (**and who have not or will not enter an appearance in this case**) are:

Giselle Huron and Alexander Greenberg, former associates at Fross Zelnick Lehrman & Zissu, P.C.

11/17/2016
_____
Date

/s/ Laura Popp-Rosenberg
_____
Signature of counsel

Please Note: All questions must be answered

Laura Popp-Rosenberg
_____
Printed name of counsel

cc: _____

Reset Fields

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ iii

I.    STATEMENT OF RELATED CASES ..........................................................1

II.   STATEMENT OF JURISDICTION ...............................................................2

III.  STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ..................3

IV.   STATEMENT OF THE CASE ......................................................................4

V.    STATEMENT OF THE FACTS ....................................................................7

      A.   The Parties...........................................................................................7

      B.   Market Use and Understanding of "Zero" in Reference
           to Soft Drinks .....................................................................................7

      C.   TCCC's Use and Attempted Appropriation of "Zero" .........................13

VI.   SUMMARY OF ARGUMENT.....................................................................15

VII.  APPLICABLE STANDARD OF REVIEW .................................................16

VIII. ARGUMENT................................................................................................17

      A.   The Board Committed Legal Error by Requiring Royal Crown
           to Prove That "Zero" Is the "Name" of a "Category" of Goods ..........17

      B.   The Board Erred by Giving Weight to TCCC's Sales of
           ZERO-Named Beverages in Assessing Genericness ...........................21

      C.   The Board Erred in Disregarding or Discounting Significant
           Evidence on the Question of Genericness ...........................................26

           1.   The Board Erred in Discounting the Evidence of
                32 ZERO-Named Soft Drinks from Companies
                Other Than TCCC .........................................................................27

           2.   The Board Erred in Disregarding Most of Royal Crown's
                Evidence of Third-Party Registrations and Applications,
                and in Discounting Those Registrations It Did Consider ..............31

3.  The Board Erred in Disregarding Evidence of the
    Parties' and Competitors' Use of "Zero" Other Than
    in Product Names ........................................................................33

4.  The Board Erred in Disregarding Evidence of How a
    Beverage Industry Trade Association Regards Zero ....................37

D.  The Board Erred as a Matter of Law in Finding That TCCC
    Had Developed Acquired Distinctiveness in "ZERO"........................39

1.  The Board Erred in Finding TCCC's Use
    to Be Substantially Exclusive ......................................................39

2.  The Board Erred By Not Explaining the Legal Basis
    on which TCCC Allegedly Acquired Distinctiveness ..................43

IX.  CONCLUSION.............................................................................................46

**NOTE ON CONFIDENTIAL MATERIAL OMITTED**

Pursuant to the Federal Circuit Rule 28(d)(1)(A), material subject to a

protective order entered by the Trademark Trial and Appeal Board of the United

States Patent and Trademark Office has been redacted from this brief.  The

confidential information on page 10 relates to sales figures of a third party, which

were designated by that third party as confidential.  The confidential information

on pages 11 and 12 relate to the results of a consumer survey undertaken on behalf

of appellee, and appellee has designated the material as confidential.

{F2100135.1 }

# TABLE OF AUTHORITIES

## CASES

*Abercrombie & Fitch Co. v. Hunting World, Inc.*, 189 U.S.P.Q. 759 (2d Cir. 1976)..................................................................24

*BellSouth Corp. v. DataNational Corp.*, 60 F.3d 1565 (Fed. Cir. 1995)..................................................................27

*Classic Foods International Corp. v. Kettle Foods, Inc.*, 468 F. Supp. 2d 1181 (C.D. Cal. 2007) ..................................28, 34, 38

*Consolidated Edison Co. of New York v. N.L.R.B*, 305 U.S. 197 (1938)..................................................................17

*H. Marvin Ginn Corp. v. International Association of First Chiefs, Inc.*,782 F.2d 987 (Fed. Cir. 1986) ....................................18

*Hewlett-Packard Co. v. Packard Press, Inc.*, 281 F.3d 1261 (Fed. Cir. 2002)..................................................................16

*In re 1800Mattress.com IP, LLC*, 586 F.3d 1359 (Fed. Cir. 2009) .............19, 20, 27

*In re Analog Devices*, 871 F.2d 1097 (Fed. Cir. 1989) ...........................................25

*In re Bayer Aktiengesellschaft*, 488 F.3d 960 (Fed. Cir. 2007) ........................ 16-17

*In re Cordua Restaurants, Inc.*, 823 F.3d 594 (Fed. Cir. 2016) .............................20

*In re G.D. Searle & Co.*,360 F.2d 650 (C.C.P.A. 1966)..........................................47

*In re Gould Paper Corp.*, 834 F.2d 1017 (Fed. Cir. 1987)......................... 35-36, 36

*In re Louisiana Fish Fry Products, Ltd.*, 797 F.3d 1332 (Fed. Cir. 2015)..................................................................22, 46

*In re Merrill Lynch, Pierce, Fenner, & Smith, Inc.*, 828 F.2d 1567 (Fed. Cir. 1987) .........................................................22

*In re Northland Aluminum Products Inc.*, 777 F.2d 1556 (Fed. Cir. 1985)..................................................................22, 26

*In re Precision Cuts, Inc.*, 131 F. App'x 288 (Fed. Cir. 2005)................................25

{F2096814.2 }

*In re Reed Elsevier Properties Inc.*, 482 F.3d 1376 (Fed. Cir. 2007) ..............*passim*

*In re Steelbuilding.com*, 415 F.3d 1293 (Fed. Cir. 2005) ........................................39

*J & J Snack Foods Corp. v. McDonald's Corp.*, 932 F.2d 1460
    (Fed. Cir. 1991) ....................................................................................44

*J. Kohnstam, Ltd. v. Louis Marx & Co.*, 280 F.2d 437
    (C.C.P.A. 1960) ....................................................................................23

*Jack Wolfskin  Ausrustung Fur Draussen GmbH & Co. KGAA v.
    New Millennium Sports, S.L.U.*, 797 F.3d 1363 (Fed. Cir. 2015) .....................17

*Juice Generation, Inc. v.GS Enterprises LLC*, 794 F.3d 1334
    (Fed. Cir. 2015) ...............................................................................31, 42

*L.D. Kichler Co. v. Davoil, Inc.*, 192 F.3d 1349 (Fed. Cir. 1999)..........................41

*Levi Strauss & Co. v. Genesco, Inc.*,742 F.2d 1401 (Fed. Cir. 1984) ..............39, 40

*Marion Laboratories, Inc. v. Biochemical/ Diagnostics Inc.*,
    6 U.S.P.Q.2d 1215 (T.T.A.B. 1988) ............................................... 44-45

*Miller Brewing Co. v. Falstaff Brewing Corp.*, 655 F.2d 5
    (1st Cir. 1981) ......................................................................................24

*Miller Brewing Co. v. G. Heileman Brewing Co.*, 561 F.2d 75
    (7th Cir. 1977)......................................................................................25

*On-Line Careline, Inc. v. America Online, Inc.*, 229 F.3d 1080
    (Fed. Cir. 2000)....................................................................................17

*Princeton Vanguard, LLC v. Frito-Lay North America, Inc.*,
    786 F.3d 960 (Fed. Cir. 2015) ...................................................16, 18

*Recot, Inc. v. Becton*, 214 F.3d 1322 (Fed. Cir. 2000) ..........................................17

*Roselux Chemical Co. v. Parsons Ammonia Co.*,
    299 F.2d 855 (C.C.P.A. 1962) ...............................................................43

*Schulmerich Electronics, Inc. v. J.C. Deagan, Inc.*,
    202 F.2d 772 (C.C.P.A. 1953) ...............................................................24

*Sexy Hair Concepts, LLC v. Christal*, Opp. No. 91177752,
    2008 WL 5454159 (T.T.A.B. Dec. 23, 2008) .....................................44

iv

*Specialty Brands, Inc. v. Coffee Bean Distributors, Inc.*,
   220 U.S.P.Q. 1072 (T.T.A.B. 1983) ...................................................45

*Spraying Systems Co. v. Delavan, Inc.*, 975 F.2d 387
   (7th Cir. 1992)..................................................................................45

*Tektronix, Inc. v. Daktronics, Inc.*, 534 F.2d 915 (C.C.P.A. 1976)........32

*Weiss Noodle Co. v. Golden Cracknel & Specialty Co.*,
   290 F.2d 845 (C.C.P.A. 1961) ...................................................23, 24

## STATUTES

15 U.S.C. § 1052 ...........................................................................5, 14, 22

15 U.S.C. § 1067 ......................................................................................2

15 U.S.C. § 1071 ..................................................................................2, 3

28 U.S.C. § 1295 ................................................................................. 2-3

## REGULATION

37 C.F.R. § 2.145 .....................................................................................3

## TREATISE

J. Thomas McCarthy, *McCarthy on Trademarks & Unfair
   Competition* (4th ed. 2015) .........................................................31, 38

{F2096814.2 }

# I.   STATEMENT OF RELATED CASES

This Court's decision in the pending appeal will directly affect several proceedings pending in the Trademark Trial and Appeal Board of the United States Patent and Trademark Office between appellee The Coca-Cola Company and third parties.  In each of these proceedings, The Coca-Cola Company has asserted its right in the trademarks at issue here to oppose a third-party application to register a ZERO-inclusive trademark for beverages.  The pending proceedings are:

- *The Coca-Cola Company v. Bawls Acquisition LLC*, Opp. No. 91230474, opposing U.S. trademark Application Serial No. 86/873,245 for BAWLS GUARANA ZERO;

- *The Coca-Cola Company v. Icee of America, Inc.*, Opp. No. 91228181, opposing U.S. trademark Application Serial No. 86/478,811 for ICEE ZERO;

- *The Coca-Cola Company v. Bovis Foods, LLC*, Opp. No. 91207116, opposing U.S. trademark Application Serial No. 85/384,208 for MARGARITA ZERO;

- *The Coca-Cola Company v. Robert J. Corr dba Naturally ZERO*, Opp. No. 91197767, opposing U.S. trademark Application Serial No. 77/946,061 for NATURALLY ZERO;

1

- *The Coca-Cola Company v. Corporación Industrial Alimenticia, S.A. de C.V.*, Opp. No. 91187638, opposing U.S. trademark Application Serial No. 77/489,223 for KLASS ZERO and Application Serial No. 77/489,224 for KLASS CERO;

- *The Coca-Cola Company v. Companhia de Bebidas das Américas – AMBEV*, Opp. No. 91186175, opposing U.S. trademark Application Serial No. 77/181,474 for GUARANA ANTARCTICA ZERO AÇÚCAR & Design; and

- *The Coca-Cola Company v. Ben & Jerry's Homemade, Inc.*, Opp. No. 91181930, opposing U.S. trademark Application Serial No. 77/128,743 for CAFE ZERO.

## II.    STATEMENT OF JURISDICTION

This appeal arises out of a final order of the Trademark Trial and Appeal Board (the "Board") of the United States Patent and Trademark Office ("USPTO") in consolidated opposition proceedings instituted by Royal Crown Company, Inc. and Dr Pepper/Seven Up, Inc. (together, "Royal Crown").  The Board, which had jurisdiction under Section 17 of the Lanham Act, 15 U.S.C. § 1067, issued its final order on May 23, 2016, disposing of all claims.  This Court has jurisdiction over the appeal of the Board's ruling in the consolidated opposition proceedings under Section 21(a)(1) of the Lanham Act Section, 15 U.S.C. § 1071(a)(1), and 28 U.S.C.

2

§ 1295(a)(4)(B).  Royal Crown timely filed a Notice of Appeal on July 21, 2016, under Section 21(a)(2) of the Lanham Act Section, 15 U.S.C. § 1071(a)(2), and 37 C.F.R. § 2.145(d)(1).

## III.    STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.    Whether the Board, in determining whether the term "zero" is generic in trademark parlance in reference to zero-calorie soft drinks, applied an incorrect legal standard by requiring Royal Crown to prove that the term "zero" is the "name of a category" of goods, when precedent requires only that the public understands the term to refer to a genus, including a key aspect thereof.

2.    Whether, in determining whether the term "zero" is generic in trademark parlance in reference to zero-calorie soft drinks, the Board erred as a matter of law by according weight to the size and sales of appellee The Coca-Cola Company ("TCCC"), when precedent establishes that such *de facto* secondary meaning is irrelevant to the genericness inquiry.

3.    Whether, in determining whether the term "zero" is generic in trademark parlance in reference to zero-calorie soft drinks, the Board, which is required to consider all competent evidence, erred in failing to consider or give proper weight to certain record evidence establishing use of the term "zero" and its numeric equivalent in reference to zero-calorie soft drinks.

4.      Whether the Board's conclusion that TCCC had established acquired distinctiveness in the term "zero" should be reversed as not supported by substantial evidence when the record showed that TCCC's use of ZERO was not substantially exclusive in light of evidence showing 32 ZERO-named soft drinks on the market that did not originate from TCCC.

5.      Whether the Board erred by not specifying the legal basis on which it concluded that TCCC had established acquired distinctiveness in the term "zero" when TCCC had never used ZERO as a stand-alone trademark and when TCCC did not prove a family of ZERO-inclusive marks.

## IV.   STATEMENT OF THE CASE

This case presents a simple question:  Should any company in the business of selling zero-calorie soft drinks have, or be granted, the exclusive right to use the term "zero"?

Appellee TCCC seeks such an exclusive right, attempting to monopolize the term "zero" throughout the soft drink industry by appending the term "zero" to its well-known soft drink brands in place of the term "diet" and then claiming ZERO as its proprietary mark.  In fact, TCCC has already asserted its alleged ZERO mark against at least sixteen other ZERO-inclusive beverage marks, including marks of Royal Crown.[1]  Because "zero" has been widely used throughout the soft drink

---

[1] *See* Statement of Related Cases; Appx5372-5496.

4

industry for years and must remain free for use, Appellant Royal Crown opposed

TCCC's attempt to register its composite ZERO-inclusive trademarks without

disclaimer of the term "zero."  Royal Crown maintains that TCCC should be

required to disclaim "zero" from the sixteen trademark applications at issue here

because the term is generic and therefore incapable of achieving trademark status

or, if the term is merely descriptive rather than generic, because TCCC has not

proved the requisite acquired distinctiveness necessary to establish the term as a

trademark.[2]

In a non-precedential final decision issued May 23, 2016, the Board granted

in part and dismissed in part Royal Crown's opposition.  More specifically, the

Board held that "zero" is not generic for the relevant genus of goods, and that

TCCC had established acquired distinctiveness in "zero" in respect of soft drinks

and sports drinks but not in respect of energy drinks.

In concluding that Royal Crown had not sustained its burden to show that

"zero" is generic, the Board improperly required Royal Crown to prove that "zero"

is the "name of the category of goods" despite cases establishing that terms are

---

[2] TCCC, in turn, opposed Royal Crown's applications to register the marks PURE
ZERO and DIET RITE PURE ZERO ("zero" disclaimed in both) under sections
2(a) and 2(d) of the Lanham Act, 15 U.S.C. § 1052(a), (d).  The Board dismissed
TCCC's claims.  (Appx32-35.)  Neither party has appealed this portion of the
Board's decision, and, therefore, TCCC's claims against Royal Crown's marks are
not at issue on this appeal.

{F2096814.2 }

generic so long as they *refer* to a genus of goods, including referring to a *key aspect* of that genus.  The Board also improperly discounted Royal Crown's voluminous evidence showing that "zero" clearly refers to zero-calorie soft drinks and instead relied on evidence of TCCC's sales volumes, despite decades of case law establishing that the type of *de facto* secondary meaning shown by such sales is irrelevant to whether a term is generic.

Additionally, in concluding that TCCC had borne its burden to show acquired distinctiveness in the purported ZERO mark, the Board surprisingly concluded that TCCC's use of ZERO as a trademark was exclusive despite uncontroverted record evidence showing that TCCC's ZERO-inclusive marks have coexisted in the marketplace with 32 other ZERO-inclusive soft drink marks.  The Board also improperly failed to explain how it determined that TCCC's purported ZERO mark had acquired distinctiveness when TCCC never used ZERO standing along as a mark, and when it used the term across a variety of soft drinks in a manner that did not create a family of marks or otherwise suggest an indication of source.

The Board's decision turns trademark law on its head, effectively allowing the dominant player in the industry to buy a monopoly in a term that others in the same industry have long been using and must have an ability to continue using.  Royal Crown therefore appeals the Board's determinations that (i) "zero" is not

6

generic in reference to the relevant genus of goods; and (ii) that TCCC has established acquired distinctiveness in term "zero" for soft drinks and sports drinks.

## V.   STATEMENT OF THE FACTS

### A.   The Parties

Appellants Royal Crown Company, Inc. and Dr Pepper/Seven Up, Inc. are both part of Dr Pepper Snapple Group ("DPSG"), the third largest refreshment beverage company in North America.  (Appx7433-7435.)  DPSG manufactures and distributes more than fifty brands of beverages.  (Appx7435.)  Appellee TCCC is the largest beverage company in the world, named for its flagship soda brand, Coca-Cola.  TCCC owns a large portfolio of soft drinks, running the gamut from waters to juices to sports drinks to carbonated soft drinks to energy drinks. (Appx9325-9327.)

### B.   Market Use and Understanding of "Zero" in Reference to Soft Drinks

This case and the current appeal do not concern merely the respective actions and rights of TCCC and Royal Crown.  Rather, what "zero" means when used in connection with soft drinks, and who is permitted to use this term, are relevant to the entire soft drink industry as well as the public at large.  Just as no entity can claim proprietary rights in the term "diet," so, too, should no entity have exclusive rights to "zero."

7

TCCC's attempt to obtain exclusive ownership of ZERO as part of a soft drink trademark ignores the undisputed fact that TCCC is not the only company that markets a ZERO-named beverage and was not even the first company to do so. No later than 2003, Southern Group Enterprises, Inc. introduced an energy drink named IMPULSE ZERO. (Appx8433, Appx8435.) It was not until a year later, in late 2004, that TCCC first adopted ZERO as part of a soft drink name, when it renamed its DIET SPRITE carbonated soft drink DIET SPRITE ZERO. (Appx9369, Appx9375-9376.) The following year, in mid-2005, both TCCC and Royal Crown introduced additional ZERO-named soft drinks: COCA-COLA ZERO soda in the case of TCCC (Appx9376-9377), and DIET RITE PURE ZERO (as the new name of DIET RITE) in the case of Royal Crown. (Appx7436.)

Southern Group Enterprises, TCCC and Royal Crown are not alone in their use of ZERO in soft drink names to indicate that the product has zero calories. The record evidence shows 30 other ZERO-named soft drinks, for a total of 32 soft drinks with ZERO-inclusive names that are *not* products of TCCC, namely:

| | | |
|---|---|---|
| All Sport Zero | Icee Zero | Rob's Really Good Zero |
| Arnold Palmer Zero | Impulse Zero | Rockstar Zero |
| Beast Zero | Jones Whoopass Zero | Rox Zero |
| Big Red Zero[3] | Margarita Zero | Runa Zero |
| Blue Sky Zero | Monster Energy Absolutely Zero | Sodastream Zero Cola |
| Bubba Zero | Monster Energy Zero Ultra | Sqwincher Zero |
| Caballa Negro Zero | Pomberry Zero | Victory Zero |
| Clearly Zero | Pre Zero | Virgil's Zero |
| Diet Crisp Zero | Propel Zero | Vita Rain Zero |
| Diet Rite Pure Zero | Red Bull Total Zero | Zero Margarita Mix |
| Holistics Zero | Roaring Lion Zero | |

(Appx4142-4159, Appx4165-4194, Appx4197-4205, Appx4208-4299, Appx4304-4313, Appx4317-4320, Appx4326-4343, Appx4444-4488, Appx6715-6762, Appx6971-6974, Appx7051-7054, Appx7109-7116, Appx7126-7138, Appx7197-7213, Appx7442-7443, Appx7881-7889, Appx7892-8033.)

These ZERO-named soft drinks are not small, niche brands. Royal Crown's DIET RITE PURE ZERO soda, for example, has been distributed in nearly 25,000 retail outlets across the United States, and from 2007 through 2012 alone retail sales volumes equated to roughly 1.8 billion 12-oz. cans of product. (Appx7438-7439, Appx7478-7481.) Similarly, PepsiCo's PROPEL ZERO product, also

---

[3] Although the packaging for BIG RED ZERO officially reads "BIG RED ZERO CALORIES," the company calls the product BIG RED ZERO, as does the public. (Appx4165-4177, Appx4426.)

9

distributed nationwide, reached sales of ███████ in the first two years

following the product's launch in 2013. (Appx4268-4284, Appx8301-8302,

Appx8316-8317, Appx8371.)  Evidence in the record showed that other ZERO-

named products on the above list also were sold nationwide in all types of retail

outlets, as well as through Internet retailers such as Amazon.com.  (Appx4153-

4159, Appx4172-4175, Appx4179-4184, Appx4203-4205, Appx4210-4215,

Appx4228, Appx4231-4236, Appx4246-4252, Appx4263-4267, Appx4287,

Appx4293, Appx4296, Appx4305-4308, Appx4312, Appx4327, Appx4333,

Appx6420-6421, Appx6424-6425, Appx6718-6729, Appx6734-6758, Appx7337-

7340, Appx7419-7425, Appx8019-8026, Appx8433, Appx8435.)

    In addition to the many soft drink companies that have used a ZERO-inclusive

soft drink name, many more have applied to register ZERO-inclusive marks for

various types of soft drinks, as evidenced by the 69 third-party trademark

applications and registrations for ZERO-inclusive marks for soft drinks that Royal

Crown made of record. (Appx4520-4767, Appx4772-4939.)  Coupled with the

evidence of ZERO-named zero-calorie soft drinks in the market, these multitudes of

trademark filings further show common acceptance and use of "zero" as an industry

term.

    The wide-scale adoption of ZERO in soft drink names to indicate that the

product has zero calories seen over the last dozen or so years did not spring out of

*CONFIDENTIAL MATERIAL REDACTED*

whole cloth or out of TCCC's imagination. Rather, the soft drink industry has a history of using "zero" or its numeric equivalent in connection with soft drinks to refer to zero calories. For example, soft drinks producers have long been legally required to use the numeral zero on "Nutritional Facts" panels to designate that a product has zero calories per serving. (Appx3764-3771, Appx3779, Appx3782, Appx3789-3798, Appx3929-3932, Appx4218, Appx5662-5663, Appx6978, Appx6981, Appx6983, Appx6985, Appx6995-7018, Appx7023-7182, Appx7203-7213, Appx7442.) In addition, the term "zero" and its numeric counterpart are widely used in "call-outs" on product labeling or packaging to call consumers' attention to the fact that a particular beverage product has zero calories. (Appx3763, Appx3772-3777, Appx3799-3806, Appx4239, Appx4301, Appx4316, Appx4321-4325, Appx4344-4346, Appx4907, Appx4967-4968, Appx5000, Appx5008, Appx6979-7006, Appx7013-7022, Appx7027-7030, Appx7041-7054, Appx7065-7104, Appx7114, Appx7117-7140, Appx7145-7153, Appx7161-7166.)

In fact, TCCC's own consumer survey confirms that as far back as November 2004 – *before* COCA-COLA ZERO was released – consumers already ████████ the ████████ in a soft drink name to ████████ In late 2004, TCCC conducted consumer research to help it select a name for the product that eventually became COCA-COLA ZERO. (Appx3810.) Of the 900 consumer respondents who saw a bottle with the name COCA-COLA ZERO but no calorie

11

CONFIDENTIAL MATERIAL REDACTED

content information, █████ believed that the product would have ████████ (Appx3816, Appx3819.)  Similarly, ██████ of the respondents viewing a bottle with the name COCA-COLA ZERO but no calorie content information believed that the statement "is ████████ described the brand ██████████ or ████████ (Appx3822.)

Since "zero" already was widely used and understood in reference to the calorie content of beverages, the term was an obvious choice within the soft drink industry to replace "diet" when that term started falling out of fashion as having negative connotations.  (Appx7437, Appx7444.)  By the time of trial below, it was clear that both the soft drink industry and the public at large understood that the term "zero," just like "diet" before it, refers to a type of beverage or a key aspect of beverages, namely those with zero calories.  For example, record evidence shows that both consumers and the media have adopted "zero" as an alternative to "diet" to indicate a category of beverages with zero calories.  (Appx4347-4438.)

Record evidence also shows that the American Beverage Association ("ABA") – a trade organization that represents the beverage industry in the United States and that counts both DPSG and TCCC among its members – views "zero" as a category of beverages.  (Appx7259-7260; *see also* Appx7.)  Specifically, in 2012, the ABA developed the following graphic for an advertising campaign, which lists "H2O," "Zero" and "Lite" as categories of beverages:

12



(Appx7260-7261, Appx7264-7265; *see also* Appx.7)

## C.    TCCC's Use and Attempted Appropriation of "Zero"

Despite the far-reaching and long-standing use of "zero" throughout the soft

drink industry including as part of soft drink names, TCCC seeks to claim

exclusivity over the term.  As part of its efforts to monopolize the term, TCCC

filed seventeen ZERO-inclusive trademark applications with the USPTO.  (Appx2-

4.)[4]  In response to every one of the applications, the USPTO issued an Office

Action requiring TCCC to disclaim "zero" because it "merely describes a feature

of the applicant's goods, namely, calorie or carbohydrate content of the goods."

(*See, e.g.*, Appx1049-1051 (Office Action for Application Serial No. 78/580,598

for COCA-COLA ZERO).)  After failing to convince the USPTO that the term

"zero" in the context of TCCC's goods is suggestive rather than descriptive, and

rather than disclaiming the term "zero" (which is the only relief Royal Crown

seeks), TCCC claimed that each of its marks had acquired distinctiveness under

---

[4] Only sixteen of these applications are at issue in this appeal.  After the Board
rendered its decision below, TCCC assigned its application for the mark FULL
THROTTLE ZERO to a third-party, who submitted a disclaimer of any exclusive
right to "zero" consistent with the Board's decision.

Section 2(f) of the Lanham Act, 15 U.S.C. § 1052(f).  The USPTO ultimately accepted TCCC's Section 2(f) acquired distinctiveness submissions, triggering the underlying consolidated opposition proceedings.

TCCC's Section 2(f) submissions did not claim acquired distinctiveness for each individual, applied-for mark; indeed, that would have been an impossibility since thirteen of the seventeen marks at issue were not in use at the time of the relevant Section 2(f) submission.  Instead, TCCC's Section 2(f) submissions claimed acquired distinctiveness in the term "zero" as the result of its use on a so-called "family of ZERO marks."  (*See*, *e.g.*, Appx880-981 (Section 2(f) submission for Application Serial No. 78/580,598 for COCA-COLA ZERO), Appx480-602 (Section 2(f) submission for Application Serial No. 77/176,279 for COCA-COLA CHERRY ZERO), Appx2061-2184 (Section 2(f) submission for Application Serial No. 77/097,644 for PIBB ZERO), Appx1684-1805 (Section 2(f) submission for Application Serial No. 76/674,382 for COKE ZERO ENERGY).)  Yet TCCC never actually proved the existence of a family of marks.  Instead, it largely relied on the sales and marketing of a single product, COCA-COLA ZERO, to claim rights in its other marks (*see, e.g.*, Appx480-602, Appx2061-2184, Appx1684-1805).

But even though TCCC seeks exclusive rights in the term "zero," it has not used the term in a way that entitles it to claim trademark or proprietary rights.  In

{F2096814.2 }

fact, the most striking evidence that "zero" is generic when used in connection with soft drinks comes from TCCC itself.  Everything TCCC does to market its ZERO-named soft drinks tells consumers that ZERO in the product's name refers to the zero-calorie content of the product.  For example, the packaging for each of TCCC's products bearing a ZERO-inclusive name vividly communicates that zero calories is the product's key attribute.  (Appx3760-3763, Appx4092-4093, Appx4097-4099, Appx4110-4113.)  And TCCC has focused its advertising around its ZERO-named products to ensure that consumers understand that "zero" means one thing:  zero-calorie beverages.  As just one example, the core marketing message of COCA-COLA ZERO soda, since almost its launch, has been "Real Coca-Cola Taste and Zero Calories" (Appx3727-3730, Appx4077-4078, Appx4089-4091, Appx4095-4096), and advertising for COCA-COLA ZERO products consistently reinforces this message.  (Appx3740-3742, Appx4100-4101, Appx4102, Appx3924-3925; *see also* Appx3743-3759, Appx3925-3926, Appx4054.)  Further, virtually every press release issued by TCCC concerning its ZERO-named soft drinks identifies zero calories as the primary product attribute. (Appx3697-3708, Appx3713-3739, Appx3927-3928.)

## V.    SUMMARY OF ARGUMENT

The law is clear that no company can turn a generic term into a trademark regardless of how extensive that company's sales are or how much the company

spends on advertising featuring the term.  Yet, that is what the Board has permitted here.  Apparently blinded by TCCC's COCA-COLA ZERO sales figures, the Board disregarded a virtual mountain of uncontested evidence in the record showing that the beverage industry, the media, and consumers understand and use the term "zero" in connection with soft drinks to refer to calorie count and that TCCC's use of ZERO as part of a soft drink name has been far from exclusive. The Board's decision virtually ensures that whenever companies fight over whether a term is a trademark or is instead free for all to use, the bigger company will always win.  The Board's legal and factual errors must be rectified so that, once again, the playing field is equal.

## VI.    APPLICABLE STANDARD OF REVIEW

Whether the Board applied the correct legal standard to the facts in front of it is a question of law.  *Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*, 786 F.3d 960, 964 (Fed. Cir. 2015).  This Court reviews the Board's legal determinations *de novo* and without deference.  *Hewlett-Packard Co. v. Packard Press, Inc.*, 281 F.3d 1261, 1265 (Fed. Cir. 2002).  This standard applies to the Court's review of the Board's errors discussed in Sections VII.A, B, D and E below.

Whether an asserted mark is generic or descriptive is a question of fact. *Princeton Vanguard*, 786 F.3d at 964; *In re Bayer Aktiengesellschaft*, 488 F.3d 960,

964 (Fed. Cir. 2007).  This Court reviews the Board's factual findings for "substantial evidence."   The substantial evidence standard requires more "than a mere scintilla" of evidence; rather, it requires "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of N.Y. v. N.L.R.B*, 305 U.S. 197, 229 (1938); *see also Jack Wolfskin Ausrustung Fur Draussen GmbH & Co. KGAA v. New Millennium Sports, S.L.U.*, 797 F.3d 1363, 1370 (Fed. Cir. 2015).  Although not *de novo* review, the substantial evidence standard "necessitates a stricter judicial review of agency fact finding" than the more deferential "arbitrary and capricious" standard. *On-Line Careline, Inc. v. Am. Online, Inc.*, 229 F.3d 1080, 1085 (Fed. Cir. 2000).  Moreover, the substantial evidence standard must be based on a review of the entire evidentiary record.  *Recot, Inc. v. Becton*, 214 F.3d 1322, 1329 (Fed. Cir. 2000) (reversing Board decision for failing to consider "all of the relevant evidence").  This substantial evidence standard controls this Court's review of the Board's errors discussed in Section VII.C below.

## VII.    ARGUMENT

### A.    The Board Committed Legal Error by Requiring Royal Crown to Prove That "Zero" Is the "Name" of a "Category" of Goods

Under well-established precedent, the test for determining whether a term is generic involves a two-step inquiry:  "First, what is the genus of goods or services at issue?  Second, is the term sought to be registered . . . understood by the relevant

17

public primarily to refer to that genus of goods or services?" *H. Marvin Ginn*

*Corp. v. Int'l Ass'n of First Chiefs, Inc.*, 782 F.2d 987, 990 (Fed. Cir. 1986); *see*

*also Princeton Vanguard*, 786 F.3d at 965.

As to the first question, the Board held that the relevant genus here is "soft

drinks, sports drinks, and energy drinks."[5]  (Appx13.)  And, since zero-calorie

drinks are a subset of the genus, the Board correctly noted that "zero" could be

generic even if it referred to only a part of the full genus.  (Appx13)  Thus, in the

language of the *Marvin Ginn* Court, the issue before the Board was whether

members of the relevant public primarily use or understand ["zero"] *to refer to the*

*genus* of goods or services in question" including a subcategory.  *Marvin Ginn*,

782 F.2d at 989-90 (emphasis added).  The Board, however, while citing the proper

inquiry (Appx12), nonetheless required Royal Crown to show something different:

that the public uses "zero" "as the ***name of a category*** of sports, energy, or soft

drinks."  (Appx17-18 (emphasis in original); *see also* Appx16 (criticizing Royal

Crown's evidence as "not demonstrat[ing] use of ZERO to *name a category of*

---

[5] The Board, however, never explained what beverages it considered the category
of "soft drinks" to encompass.  Implicitly, however, it used "soft drinks" to mean
only *carbonated* soft drinks, since it determined that energy drinks, sports drinks,
enhanced water, packaged ice teas, and other soft drinks fell outside the category.
(*See*, *e.g.*, Appx13, Appx16 n.16, Appx17 n.18).  As discussed below, this implicit
limitation of the "soft drinks" category was contrary to the evidence of record and
resulted in the Board improperly disregarding relevant evidence.  *See* Section
VII.C.1, *infra*.

*goods*") (emphasis added); *cf.* Appx25 (implying that proffered evidence of TCCC's own use of "zero" other than as part of a mark is not relevant to genericness inquiry because such use "do[es] not *name the genus* of [TCCC's] goods") (emphasis added)).

This Court has never held that a term is generic and incapable of trademark protection only if it is used to designate the "name" of a "category." In fact, the opposite is true: this Court explicitly has held it to be "irrelevant" that the public does not use the challenged term as the name of a category and confirmed that the inquiry is broader than that:

> We further disagree with Dial-A-Mattress's assertion that the mark MATTRESS.COM is not generic because the relevant public would not use the term "mattress.com" to refer to online mattress retailers. The test is not only whether the relevant public would itself *use* the term to describe the genus, but also whether the relevant public would *understand* the term to be generic. . . . Thus, it is irrelevant whether the relevant public refers to online mattress retailers as "mattress.com." Instead, as the Board properly determined, the correct inquiry is whether the relevant public would understand, when hearing the term "mattress.com" that it refers to online mattress stores.

*In re 1800Mattress.com IP, LLC*, 586 F.3d 1359, 1364 (Fed. Cir. 2009) (emphasis in original).

Thus, case law is clear that "refer to [a] genus" in the *Marvin Ginn* test means something far broader than the name of a category. In fact, it is not even necessary for the public to understand that the term at issue refers to a genus *per*

{F2096814.2 }

*se*.  Rather, multiple cases hold that "a term can be generic for a genus of goods and services if the relevant public . . . understands the term to refer to a *key aspect* of that genus."  *In re Cordua Rests., Inc.*, 823 F.3d 594, 603 (Fed. Cir. 2016) (emphasis added) ("churrasco" being a generic term for a type of cooked meat is also generic for a restaurant featuring such cooked meat).  For example, in *In re Reed Elsevier Properties Inc.*, 482 F.3d 1376, 1378 (Fed. Cir. 2007), this Court affirmed the Board's finding that LAWYERS.COM was generic for "providing access to an online interactive database featuring information exchange in the fields of law, legal news, and legal services" due to "the congruency between the genus of services that Reed sought to identify with its mark and the nature of the relevant public's understanding of the services its mark evokes."  *Id*.  The fact that the term "lawyer" clearly is not the "name" of a "category" of websites featuring legal information and news did not prevent the Court from finding LAWYERS.COM generic for such services.  *See also 1800Mattress.com*, 586 F.3d at 1364 (affirming Board's conclusion that 1800MATTRESS.COM is generic because "mattress" identifies a "key aspect" of the "retail store services in the field of mattresses, beds, and bedding" at issue).

The rationale for case law holding that, to be generic, a term need not *name* a *category* of goods is self-evident.  This ensures that referential terms – in this

{F2096814.2 }

case, "zero" – remain available for common use and are not appropriated by any single competitor to the disadvantage of the industry as a whole.

Here, the evidence of record demonstrates that there is a congruence between the genus of goods at issue, namely soft drinks, and the public's understanding of the type of product "zero" evokes when used in reference to that genus. "Zero" clearly identifies a key aspect of a category of soft drinks, namely, those with zero calories. By holding Royal Crown to an improper legal standard and requiring Royal Crown to show that "zero" is the "name of a category," the Board arrived at the wrong conclusion. This case should be remanded for reconsideration under the proper legal standard of the substantial evidence showing that "zero," when used in connection with soft drinks, is understood as a reference to the number of calories and thus to zero-calorie soft drinks.

## B.    The Board Erred by Giving Weight to TCCC's Sales of ZERO-Named Beverages in Assessing Genericness

Not only did the Board commit legal error by improperly requiring Royal Crown to prove that "zero" is the "name" of a "category" of goods, the Board also committed legal error by relying on TCCC's evidence of *de facto* secondary meaning to conclude that "zero" is not generic in reference to soft drinks. In fact, TCCC's sales were the only evidence the Board weighed against Royal Crown's evidence of genericism. (*See*, *e.g.*, Appx17 (discounting Royal Crown's evidence of its own and third-party ZERO-named beverages because "the overall use

21

appears to be relatively minor in comparison to TCCC's, representing a small fraction of TCCC's use of the term for its goods"); Appx24 (a "handful of public references [to "zero" as a category of beverages] spread over five years does not establish that ordinary consumers primarily use or understand the term ZERO to refer to the genus of soft drinks, sports drinks, or energy drinks . . . . particularly . . . in the context of the ubiquity of TCCC's ZERO products, which have had billions of dollars in sales.").

Giving conclusive weight to TCCC's sales evidence was error because clear precedent from this Court and others establishes that *de facto* secondary meaning evidence – which is all TCCC's sales data is – cannot be considered in determining whether a term is or is not generic. While the Lanham Act provides that a merely descriptive term can acquire secondary meaning among consumers and thus qualify as a mark, 15 U.S.C. § 1052(f), there is no such provision for generic terms. *In re Merrill Lynch, Pierce, Fenner, & Smith, Inc.*, 828 F.2d 1567, 1569 (Fed. Cir. 1987). Indeed, it is a basic tenet of trademark law that "'[g]eneric terms cannot be rescued by proof of distinctiveness or secondary meaning no matter how voluminous the proffered evidence might be.'" *In re Northland Aluminum Prods. Inc.*, 777 F.2d 1556, 1558 (Fed. Cir. 1985); *see In re La. Fish Fry Prods., Ltd.*, 797 F.3d 1332, 1338 (Fed. Cir. 2015) (Newman, J., concurring) ("Generic terms and

common descriptive names[6] cannot acquire trademark status, and evidence

purporting to show acquired distinctiveness or secondary meaning is irrelevant.");

*Weiss Noodle Co. v. Golden Cracknel & Specialty Co.*, 290 F.2d 845, 848

(C.C.P.A. 1961) ("[M]erchants act at their peril in attempting, by advertising, to

convert common descriptive names, which belong to the public, to their own

exclusive use.  Even though they succeed in the creation of de facto secondary

meaning, due to lack of competition or other happenstance, the law respecting

registration will not give it any effect."); *J. Kohnstam, Ltd. v. Louis Marx & Co.*,

280 F.2d 437, 440 (C.C.P.A. 1960) ("[W]*here there is only one source for a*

*particular kind of merchandise* over a period of time, the public might come to

associate that source with the name by which the merchandise is called.  But such a

circumstance cannot take the *common descriptive* name of an article out of the

---

[6] Before a change to the Lanham Act codified that "descriptive" terms can achieve trademark status through evidence of acquired distinctiveness, the phrase "common descriptive names" was frequently used in case law to designate a category of names that could not acquire trademark status, equivalent to what we now call almost exclusively "generic" names.  While the transition from the phrase "common descriptive names" to the term "generic" made sense from the standpoint of trying to eliminate nomenclature confusion between names that can achieve trademark status (descriptive) and those than cannot (generic), the transition was nonetheless unfortunate to the extent it may have led courts and practitioners to an improper rigidity in distinguishing between types of names in assessing trademark status.  Although Judge Newman's concurring opinion in *Louisiana Fish Fry* does not explicitly make this point, his pointed use of the phrase "common descriptive names," which had largely been unseen for some time in trademark opinions, suggests the point nonetheless.

{F2096814.2 }

public domain and give the temporarily exclusive user of it exclusive right to it, not matter how much money or effort it pours into promoting the sale of the merchandise.") (emphases added); *Schulmerich Elecs., Inc. v. J.C. Deagan, Inc.*, 202 F.2d 772, 778 (C.C.P.A. 1953) ("[I]t has always been the rule that any such generically descriptive mark may not be exclusively appropriated as a trademark, regardless of how long a claimant fortuitously may have enjoyed the exclusive use thereof in trade."); *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 189 U.S.P.Q. 759, 764 (2d Cir. 1976) ("[N]o matter how much money and effort the user of a generic term has poured into promoting the sale of its merchandise and what success it has achieved in securing public identification, it cannot deprive competing manufacturers of the product of the right to call an article by its name.").

Consequently, a long line of cases have rejected *de facto* secondary meaning evidence in analyzing the question of genericness.  *See, e.g.*, *Weiss Noodle*, 290 F.2d at 847-48 ("The examiner erred in accepting the showing of 'distinctiveness' in granting the registration because no matter what the market situation may have been as to indication of origin or secondary meaning, the common descriptive name of the product cannot became a trademark owned exclusively by one vendor."); *Miller Brewing Co. v. Falstaff Brewing Corp.*, 655 F.2d 5, 9 (1st Cir. 1981) (evidence showing that the public perceived Miller to be the source of LITE

beer was irrelevant); *Miller Brewing Co. v. G. Heileman Brewing Co.*, 561 F.2d 75, 81 (7th Cir. 1977) ("The word 'light,' including its phonetic equivalent 'lite,' being a generic or common descriptive term as applied to beer, could not be exclusively appropriated by Miller as a trademark, despite whatever promotional effort Miller may have expended to exploit it.") (internal quotation marks and citations omitted); *In re Precision Cuts, Inc.*, 131 F. App'x 288, 291 (Fed. Cir. 2005) (unpublished) ("PCI's evidence of secondary meaning is irrelevant" to counter genericism evidence); *In re Analog Devices*, 871 F.2d 1097, 10 U.S.P.Q.2d 1879, 1879 (Fed. Cir. 1989) (unpublished) (rejecting evidence that term ANALOG DEVICES had come to be associated with applicant, holding that "[s]uch evidence does not, indeed cannot, *rebut* genericness") (emphasis in original).

The Board's determination that TCCC's sales volumes outweighed Royal Crown's evidence of genericness was improper as a matter of law, jettisoning bedrock legal principles by essentially letting TCCC buy trademark rights in a generic term. This Court should therefore reverse the Board's decision and instruct the Board to disregard all evidence of TCCC's sales and advertising expenditures in determining whether "zero" is or is not generic in reference to soft drinks.[7]

---

[7] Even if the Board were permitted to consider evidence of TCCC's sales in assessing whether "zero" is generic, the Board nonetheless erred in automatically equating those sales with public recognition of "zero" as a designation of source (i.e., as a trademark) rather than equating such sales with the public's understanding that "zero" refers to a key aspect of certain soft drinks (i.e., a

When the evidence of TCCC's sales are properly excluded from the genericness

inquiry, there is nothing in the Board's opinion to counter Royal Crown's evidence

that the public understands that "zero" when used in connection with soft drinks

refers to a key aspect – namely, zero calories.

## C.    The Board Erred in Disregarding or Discounting Significant Evidence on the Question of Genericness

Although Royal Crown submitted extensive evidence of different types to

show that "zero" is understood to refer to a genus of soft drinks or a key aspect of

that genus, the Board disregarded much of the proffered evidence as irrelevant to

the genericness inquiry.  Other evidence it discounted, including to the point of

seeming to give the evidence no weight.  In both cases, it erred, as explained

below.

Precedent dictates that the public's perception of a term can be obtained

from "any competent source."  *Northland Aluminum*, 777 F.3d 1559.  Although

this Court has provided examples of types of evidence that may be considered –

such as consumer surveys, dictionaries, newspapers and other publications – this

Court has neither required that a party present all of these forms of evidence in

order to prove that a term is generic nor rejected other types of evidence that have

---

generic term).  There is simply no evidence in the record supporting the Board's
assumption that the volume of TCCC's sales means that consumer perceive "zero"
to be a brand rather than a reference to the number of calories in the product.

a bearing on how the public may perceive a term.  Yet that is exactly what the

Board seems to have done here.  First, it criticized Royal Crown for not submitting

"direct" evidence of consumer perception in the form of a consumer survey or

testimony and for not submitting a dictionary entry (Appx15), and then it

disregarded or gave no weight to Royal Crown's voluminous indirect evidence

showing what the public understands when "zero" is used in connection with soft

drinks.  The Board's mishandling of relevant evidence requires reversal.

### 1. The Board Erred in Discounting the Evidence of 32 ZERO-Named Soft Drinks from Companies Other Than TCCC

The uncontroverted evidence of record shows that in addition to TCCC's

several ZERO-named soft drinks, 32 ZERO-named soft drinks from companies

other than TCCC have existed in the marketplace, at least some for more than

eleven years.  There is no debate that such competitive use of a term is one

competent source from which Courts and the Board can determine the public's

understanding of a term.  *See*, *e.g.*, *BellSouth Corp. v. DataNational Corp.*, 60 F.3d

1565, 1572 (Fed. Cir. 1995) (affirming Board's reliance on competitive use to find

logo generic); *1800Mattress.com IP*, 586 F.3d at 1363 (appropriate for Board to

consider "prevalence of the term 'mattress.com' in the website addresses of several

online mattress retailers that provide the same services as [applicant]," as such uses

"illuminate what services the relevant public would understand a website operating

under the term 'mattress.com' to provide"); *Reed Elsevier Props.*, 482 F.3d at 1380

27

(citing with approval the Board's consideration of eight third-party websites containing "lawyer.com" in analyzing whether LAWYER.COM is generic because such third party sites "illuminate what services the relevant public would understand a website operating under Reed's mark to provide"); *Classic Foods Int'l Corp. v. Kettle Foods, Inc.*, 468 F. Supp. 2d 1181, 1190 (C.D. Cal. 2007) (a term's use by competitors is "strong evidence of how the public perceives the term").

Despite a long line of case law holding that the existence of ZERO-named soft drinks sold by producers other than TCCC is relevant to the genericness inquiry – and despite the sheer number of such ZERO-named soft drinks in the record here – the Board improperly disregarded certain of those marks and improperly gave no weight to others, as explained below.

The Board erred in excluding evidence related to the marks PROPEL ZERO, ARNOLD PALMER ZERO, ICEE ZERO, MARGARITA ZERO and ZERO MARGARITA MIX on the basis that the marks are not used for "soft drinks, sports drinks, and energy drinks," which the Board determined to be the relevant genus for the genericness inquiry.  (Appx16 n.16, Appx17 n.18.)  While the excluded trademarks may not be used for *carbonated* soft drinks like COCA-COLA ZERO, that does not make them irrelevant.

28

As an initial matter, there is no support in the record for the Board's limitation of the category of "soft drinks" to only *carbonated* soft drinks. Rather, the record shows that the parties – both leaders in the soft drink industry – use the term "soft drink" to mean any of a variety of non-alcoholic drinks, including not only carbonated sodas, but also sports drinks, energy drinks, enhanced waters, and other beverages. Because it was error for the Board to limit the broad category of "soft drinks" to only carbonated soft drinks, it also was error for the Board to exclude evidence of certain ZERO-named soft drinks on that basis.

Moreover, even if the Board had been correct to limit "soft drinks" to only carbonated soft drinks, it still would have been improper to exclude beverages outside of this category. Use of "zero" to indicate zero calories as opposed to source even on beverages outside the defined genus also could impact how the public perceives "zero" when used on beverages within the defined genus.

Beyond improperly rejecting certain evidence, the Board also erred by giving insufficient weight, if any at all, to evidence that companies other than TCCC use ZERO-inclusive soft drink marks.

First, the Board discounted the evidence of ZERO-inclusive soft drink marks from companies other than TCCC on the basis that "the overall use appears to be relatively minor in comparison to TCCC's, representing a small fraction of TCCC's use of the term for its goods." (Appx17.) But, to Royal Crown's

{F2096814.2 }

knowledge, there is no case from this Court requiring a certain minimum sales threshold to be met before third-party use of a term can be considered relevant to the genericism inquiry.  The reason is simple:  it is the *fact* that these ZERO-inclusive marks exist, not the *extent* of their sales, that is relevant to the the question of whether "zero" is generic.  The fact that Royal Crown and numerous third-parties have adopted ZERO as a part of soft drink trademarks shows how the soft drink industry considers and treats the term.  The evidence should have been considered by the Board for that purpose regardless of the underlying sales volumes.

Second, the Board discounted Royal Crown's evidence that companies other than TCCC sell ZERO-named beverages on the basis that "there is nothing to link the third-party uses to evidence that the public primarily uses or understand the term ["zero"] to refer to the genus of goods or services."  (Appx17 (internal quotation omitted)).  In other words, the Board discounted Royal Crown's evidence because it was indirect, rather than direct, evidence of how the public perceives the term "zero."  As discussed above, however, case law explicitly recognizes that trade usage is indirect evidence of how the public perceives a term. The Board, therefore, also erred in disregarding Royal Crown's evidence on the basis that it was indirect rather than direct evidence of public perception.

{F2096814.2 }

**2. The Board Erred in Disregarding Most of Royal Crown's Evidence of Third-Party Registrations and Applications, and in Discounting Those Registrations It Did Consider**

Royal Crown submitted evidence of 69 third-party trademark registrations and applications in the soft drink category from 46 different companies, all of which include "ZERO" as a portion of the mark.  (Appx4520-4767, Appx4772-4939.)  The Board disregarded all but seven of these, refusing to consider anything but live registrations.  (Appx18.)  In relation to the trademark applications proffered by Royal Crown, the Board rejected them as being evidence of nothing more than "that they were filed."  (Appx18 n.19.)  As for the cancelled and expired trademark registrations, the Board rejected them as not evidencing "presently existing rights in the mark shown, or that it was ever used."  (Appx18 n.19.)

Once again, the Board seems to have misunderstood the relevance of the evidence, rejecting it for reasons that have no bearing on its relevance.  As this Court recently held in *Juice Generation, Inc. v.GS Enterprises LLC*, 794 F.3d 1334 (Fed. Cir. 2015), third-party registrations of the very type rejected by the Board here "'show the sense in which . . . a mark is used in ordinary parlance.'"  794 F.3d at 1339 (quoting 2 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 11:90 (4th ed. 2015)).  Thus, they are competent evidence to show how the trade considers and treats the term "zero" in relation to soft drinks.  This hold true regardless of whether the term "zero" is found in live trademark

31

registrations, cancelled trademark registrations, expired trademark registrations, or pending trademark applications.  In fact, this Court also has previously held that even if "there is no evidence of actual use" of marks shown in third-party registrations, such registrations "may be given some weight to show the meaning of a mark in the same way that dictionaries are used." *Tektronix, Inc. v. Daktronics, Inc.*, 534 F.2d 915, 917 (C.C.P.A. 1976) (cited with approval in *Juice Generation*).

Thus, the Board's refusal to consider the majority of Royal Crown's trademark registration and application evidence was in blatant disregard of the applicable law.  There is no principled reason why cancelled and expired trademark registrations and trademark applications should be considered any less competent than subsisting registrations to show how the trade perceives and treats the term "zero," and the Board offered none.  All of Royal Crown's proffered trademark application and registration evidence therefore should have been considered for this purpose.

For the same reason, it was error for the Board to discount the weight of the seven trademark registrations submitted by Royal Crown that it did consider probative.  In reviewing those registrations, as well as three additional registrations submitted only by TCCC, the Board focused on whether the term "zero" had been disclaimed or not, and concluded that because the term largely had been

32

disclaimed, the registrations were equally consistent with the conclusion that "zero" is descriptive as with the conclusion that it is generic. (Appx20-21.) But, again, the Board appears to have misunderstood the relevance of the proffered evidence, leading it inappropriately to focus on how USPTO examiners view the term. Regardless of whether or not the USPTO requires "zero" to be disclaimed, the very fact that trademark registrations for soft drinks from multiple companies include the term "zero" shows that those in the soft drink trade commonly deploy the term in reference to the genus of soft drinks. As such, the Board erred in discounting the evidence.

### 3. The Board Erred in Disregarding Evidence of the Parties' and Competitors' Use of "Zero" Other Than in Product Names

As explained above, there is no question that competitive use of a term is relevant to the genericness inquiry. The Board nonetheless improperly disregarded evidence showing how competitors use the term "zero."

Royal Crown presented evidence that the term "zero" and numeral "0" are used throughout the beverage industry in reference to soft drinks having zero calories, including on nutritional panels, in packaging call-outs, and in product names. As Royal Crown argued below, the array and prevalence of such uses has conditioned consumers to understand that "zero" refers to the calorie content of beverages and thus identifies a specific type of soft drinks, namely, those with zero calories. The Board, however, concluded that evidence of use on nutritional panels

{F2096814.2 }

and packaging call-outs merely "conveys information about the goods to consumers" and "does not demonstrate use of ZERO to name a category of goods," and therefore does not thereby "render [the term "zero"] generic." (Appx16.)

The Board's refusal to weigh in its analysis evidence of industry use of the term "zero" and its numerical equivalent on nutritional panels and packaging call-outs appears to be tied to its improper requirement that Royal Crown prove that "zero" is the "name" of a "category" of goods. But courts have made clear that evidence of even *descriptive* use of a term can tend to show that a term is generic. *See*, *e.g.*, *Classic Foods Int'l*, 468 F. Supp. 2d at 1195 (although plaintiff claimed to be the only one to use KETTLE as a trademark while competitors used "kettle" in a descriptive manner, the court determined that "consumers who encounter 'Kettle Chips,' 'Kettle Classics,' and the wide variety of other 'kettle' products on the market will not associate the term 'kettle' with [plaintiff]'s products, but will merely view it as a designation for a type of chips").

The widespread and longstanding use of the term "zero" and its numerical counterpart, even in an arguably descriptive manner, throughout the beverage industry has conditioned consumers to view "zero" as referring to calorie content and more specifically to beverages with a calorie content of zero. Conditioned thusly, those consumers who come across products with ZERO in the brand name will view that term as referring to key aspect of the soft drink – zero calories – not

34

as a designation of source of the products. Such understanding of the term "zero" to refer to a key aspect of the genus of goods renders the term generic. The Board therefore erred as a matter of law in rejecting Royal Crown's evidence of industry use of the term "zero" and numeral "0" on nutritional panels and label call-outs as incapable of showing that "zero" is understood to be a generic reference to a type of soft drinks.

The Board's disregard of evidence showing TCCC's own descriptive use of "zero" and "0" on the same basis was particularly egregious. Although the Board acknowledged that TCCC used the term "zero" and the numerical "0" in connection with and in reference to its zero-calorie soft drinks on nutritional panels, on label call-outs, in advertisements and in press releases (Appx24), the Board held that such uses are irrelevant to the question of whether "zero" is generic. (Appx25 ("Although such uses of ZERO and 0 by TCCC certainly convey information about the nature of its products – including primarily that they contain zero . . . calories – they do not name the genus of the goods."). But evidence that TCCC uses "zero" other than as part of the name of its products is relevant both for the same reasons discussed above and for an additional reason: although TCCC claims in these proceedings that it is using "zero" as an indication of source, everything it does in fact tells consumers that "zero" refers to the genus or a key attribute of the genus and is *not* an indication of source. *In re Gould*

35

*Paper Corp.*, 834 F.2d 1017, 1019 (Fed. Cir. 1987) (a party's own use can

"provide[] the most damaging evidence that its alleged mark is generic and would

be perceived as common name for its goods."); *cf. Reed Elsevier Props.*, 482 F.3d

at 1379 ("[L]ooking at Reed's website makes clear that an integral, if not

paramount, aspect of 'information exchange about legal services" as Reed defines

it[s services] concerns identifying and helping people to select lawyers.  This is

amply demonstrated by the ubiquitous nature of the 'search for lawyers' and 'find

a lawyer" functions" on the website; finding LAWYERS.COM generic for such

services).

     This Court's decision in *In re Gould Paper* is particularly on point.  In that

case, the applicant's specimen of use for its SCREENWIPE product advised that

the product was 'a . . . wipe . . . for . . . screens.'"  834 F.2d at 1018-19.  As this

Court explained, based on the applicant's own description of its product,

"[n]othing is left for speculation or conjecture in the alleged trademark.  The

compound [SCREENWIPE] immediately and unequivocally describes the purpose,

function and nature of the goods as Gould itself tells us."  *Id.* at 1019.  Similarly,

looking at everything related to TCCC's ZERO-named beverages – the packaging,

the advertising, and the press releases – there is nothing left for speculation or

conjecture about TCCC's use of "zero":  it, too, "immediately and unequivocally

describes the purpose, function and nature of the goods."  *Id.*; *see also Reed*

{F2096814.2 }

*Elsevier Props.*, 482 F.3d at 1379 ("looking at Reed's website makes clear that an integral, if not the paramount, aspect of 'information exchange about legal services' [offered under the alleged LAWYERS.COM mark] concerns identifying and helping people select lawyers'" LAWYERS.COM found to be generic).

### 4. The Board Erred in Disregarding Evidence of How a Beverage Industry Trade Association Regards Zero

As noted above, the ABA – a trade organization representing the beverage industry – developed an advertisement in which "zero" was used to refer to a category of beverages.  (Appx7260-7261, Appx7263-7265.)  The Board refused to consider this advertisement on the ground that Royal Crown's witness did not know whether the other companies represented in the advertisement, including TCCC, had approved the graphic, or whether the particular graphic shown in the record was actually disseminated in the marketplace.  (Appx7 & n.8.)  Regardless of whether the Board's characterization of the testimony was accurate, the Board again misunderstood the relevance of the evidence and rejected it for reasons that have no impact on that relevance.

The advertisement and the corresponding testimony establish that a trade organization for the beverage industry considers and uses "zero" to designate a category of beverages.  When the advertisement and testimony is considered for this purpose, whether TCCC approved the advertisement, or whether consumers saw the advertisement, have no bearing on the advertisement's relevance or its

37

admissibility.  Even if TCCC did not approve the advertisement or consumers never saw it, the fact remains that the ABA trade group, of which both Royal Crown's parent and TCCC are members, views "zero" as designating a type of beverages.  This is undeniably relevant in the determination of whether "zero" is generic for beverages.  *Cf. Classic Foods Int'l*, 468 F. Supp. 2d at 1192 (citing 2 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 12:13 (4th ed. 2006)) (opinions of industry leaders are "particularly helpful . . . in determining the genericness of a term").

*    *    *    *    *

In this case, the record makes clear that zero, both in word and numeral form, has been and continues to be widely used in the soft drink industry in reference to zero-calorie soft drinks, both by the parties to these proceedings, their competitors, and the industry generally, and that consequently the term "zero" is recognized by the public as referring to zero-calories when used in connection with soft drinks.  The Board, however, disregarded or discounted swaths of evidence, apparently concluding that TCCC's sales overshadowed everything else.  The Board's many errors – from holding Royal Crown to the wrong legal standard, to giving conclusive weight to irrelevant evidence, and disregarding probative evidence – resulted in the Board coming to the incorrect conclusion that "zero" is not generic when used in reference to soft drinks.  These errors, and their

38

cumulative effect, require that this Court reverse the Board's decision on the question of genericness, and remand this case back to the Board for a proper consideration of all of the probative evidence under the correct legal standard.

**D.     The Board Erred as a Matter of Law in Finding That TCCC Had Developed Acquired Distinctiveness in "ZERO"**

TCCC's sales of its COCA-COLA ZERO product have been impressive by virtually any measure.  But the Board erred when it decided that TCCC's sales figures overshadowed everything else in the record.  The Board's first error was concluding that TCCC's use of "zero" was substantially exclusive notwithstanding evidence of 32 soft drink products from companies other than TCCC being sold under a ZERO-inclusive brand.  The Board's second error was failing to explain exactly how TCCC acquired distinctiveness in the term "zero" when TCCC never used ZERO as a stand-alone trademark and when it used the term across a variety of soft drinks in a manner that neither created a family of marks nor otherwise suggested an indication of source.

**1.     The Board Erred in Finding TCCC's Use to Be Substantially Exclusive**

"To show that a mark has acquired distinctiveness, an applicant must demonstrate that the relevant public understands the primary significance of the mark as identifying the source of a product or service rather than the product or service itself."  *In re Steelbuilding.com*, 415 F.3d 1293, 1297 (Fed. Cir. 2005).

39

Part of establishing acquired distinctiveness is showing "substantially exclusive and continuous use" of a mark in commerce. *Levi Strauss & Co. v. Genesco, Inc.*, 742 F.2d 1401, 145 (Fed. Cir. 1984). Thus, "[w]hen the record shows that purchasers are confronted with more than one (let alone numerous) independent users of a term . . . an application for registration under Section 2(f) *cannot* be successful, for distinctiveness on which purchasers may rely is lacking under such circumstances." *Id.* at 1403 (emphasis added). Yet, despite the record here showing that consumers have been confronted with *numerous* independent users of ZERO-named soft drinks, the Board nonetheless concluded that TCCC's use was somehow sufficiently exclusive to permit the acquisition of exclusive trademark rights. This conclusion was clear error.

Royal Crown introduced uncontroverted evidence of 32 ZERO-named beverage products from sources other than TCCC – including Royal Crown's own DIET RITE PURE ZERO product which has been sold nationwide for more than eleven years, almost exactly the same amount of time as TCCC's COCA-COLA ZERO product. There is no question, then, that TCCC's use of ZERO-named beverages has not been exclusive. The Board, however, called Royal Crown's evidence of non-TCCC use of ZERO-named beverages "inconsequential," and thereby concluded that TCCC's use was sufficiently "substantially exclusive" for

acquired distinctiveness.  In doing so, the Board stretched the "substantially

exclusive" standard beyond any reasonable bounds.

In rejecting Royal Crown's evidence of third-party use as inconsequential,

the Board relies on *L.D. Kichler Co. v. Davoil, Inc.*, 192 F.3d 1349 (Fed. Cir.

1999).  That case, however, does not stand for the proposition that the Board can

sweep aside evidence that consumers have been presented with 32 different

products bearing the same mark in which the applicant claims acquired

distinctiveness.  In fact, in the *L.D. Kichler* case, this Court remanded to the Board

the question of whether only *three* other products on the market precluded a

finding of acquired distinctiveness.

In discounting the dozens of third-party uses presented by Royal Crown

here, the Board once again seemed unable to see beyond TCCC's sales volume of

its COCA-COLA ZERO product, focusing on the fact that the other sellers of

ZERO-named beverages, including Royal Crown itself, did not have sales

anywhere near those of TCCC.[8]  But whether any other product can match the

sales success of TCCC's products is not the standard.

---

[8] Although the Board did not call Royal Crown's DIET RITE PURE ZERO sales
of roughly 1.8 *billion* cans in *25,000* retail outlets over the five-year period
between 2007 and 2012 "inconsequential," the Board nonetheless concluded that
Royal Crown's sales were irrelevant because there was no evidence in the record
evidencing the "public's understanding of the mark DIET RITE PURE ZERO, or
that ZERO in that mark primarily identifies the source of a product."  (Appx40.)
But that was the wrong inquiry, since Royal Crown has never asserted that

41

This Court's recent decision in *Juice Generation* is instructive.  In that case, in an effort to show that opposer's mark was weak, the applicant had introduced a number of third-party uses of marks containing the same operative terms claimed in opposer's mark.  794 F.3d at 1337 & n.1.  The Board discounted the third-party evidence "because there were no 'specifics regarding the extent of sales or promotional efforts surrounding the third-party marks and, thus, what impact, if any these uses have made in the minds of the purchasing public.'"  *Id.* at 1339 (citation omitted).  This Court reversed, finding that the Board had not "adequately account[ed] for the apparent force" of the third-party use evidence.  *Id.*  This Court concluded that although the "'specifics' as to the extent and impact of use of the third parties' marks may not have been proven," the circumstances of the case made the evidence "powerful on its face.  The fact that a considerable number of third parties use similar marks was shown in uncontradicted testimony."  *Id.*

The same is true here.  The fact that consumers have seen 32 ZERO-named products that do not come from TCCC on its face weighs strongly against   any claim that "zero" designates TCCC exclusively.  In fact, the predecessor to this Court previously has warned against discounting evidence of third parties simply because they do not sell as much product as the trademark proponent:

---

consumers recognize ZERO as a designation of source, whether the term appears in Royal Crown's products or anyone else's.

> The fact that Parsons was enjoying sales of such product many times the volume of all other sellers combined . . . is not ground for impairing the rights of those others, though they may be small, to be free from possible restraint in the use of the common descriptive names of their products. . . . As of the time when registration is being sought, others are, or in the immediate past were, using the term [SUDSY] descriptively on the same or closely similar products, precluding the possibility that it could, to purchasers, generally, indicate origin only in Parsons.

*Roselux Chem. Co. v. Parsons Ammonia Co.*, 299 F.2d 855, 862-63 (C.C.P.A. 1962).

Regardless of whether other companies' ZERO-named soft drinks matched or even approached the sales success of TCCC's products, consumers presented with so many ZERO-named soft drinks in the market would never be able to rely on the "zero" portion of the mark alone to differentiate source. In these circumstances, it was clear error for the Board to conclude that TCCC had developed acquired distinctiveness in the "ZERO" portion of its soft drink trademarks.

### 2. The Board Erred By Not Explaining the Legal Basis on which TCCC Allegedly Acquired Distinctiveness

It is undisputed that TCCC never used "zero" as a stand-alone trademark. It also is undisputed that TCCC has never even used some of the ZERO-inclusive trademarks at issue. The Board ignored these critical facts in concluding that

{F2096814.2 }

TCCC had acquired distinctiveness in "zero" per se for soft drinks and then offered no legal basis to support its conclusion. (*See* Appx25-30.) This was clear error.

There is one clear path to acquired distinctiveness when a party is claiming trademark rights in a descriptive term that is only a portion of the mark being used, as TCCC does here: showing that the relevant portion of the mark is the common element of a family of marks.[9] *See*, *e.g.*, *Sexy Hair Concepts, LLC v. Christal*, Opp. No. 91177752, 2008 WL 5454159, at *3 (T.T.A.B. Dec. 23, 2008). This is the path TCCC followed in its Section 2(f) submissions of acquired distinctiveness, asserting acquired distinctiveness in the "zero" portion of its composite marks on the theory that it possessed a family of marks in which "zero" was the common element. At trial, however, neither TCCC nor the Board could follow this path since TCCC failed to submit any evidence establishing that its ZERO-named beverages were used or advertised in such a manner as to create a family of marks. (Appx8640-8641, Appx8882-8884.)[10] In fact, the Board rightly refused to give any

---

[9] As this Court has explained, a family of marks is a group of marks having a recognizable common characteristic, wherein the marks are composed and used in such a way that the public associates not only the individual marks, but also the common characteristic of the family, with the trademark owner. *J & J Snack Foods Corp. v. McDonald's Corp.*, 932 F.2d 1460, 1462 (Fed. Cir. 1991).

[10] Even if the record included evidence of the type required to establish a family of marks, the Board still would not have been able to find a family of marks around the term "zero." The claimed common member of a family of marks must be distinctive, that is, not descriptive or so highly descriptive that it cannot function as a distinguishing characteristic of the marks. *Marion Labs., Inc. v. Biochemical/*

44

weight to the few advertisements TCCC attempted to submit to show that certain

of its ZERO-named beverages had been advertised together.  (Appx6-7.)[11]

Since TCCC could not successfully follow the family of marks path to show

acquired distinctiveness in "zero" at trial, its only hope was to dazzle the Board

with its sales volumes of COCA-COLA ZERO (which dwarfed the sales volumes

of its other ZERO-named products) and pray that the Board would conclude this

was sufficient to show acquired distinctiveness in the term "zero" standing alone.

But this Court has shown a real reluctance to approve claims of partial acquired

distinctiveness when the evidence pertains to use of a composite mark and not to

the specific portion in which acquired distinctiveness is claimed.  For example, in

---

*Diagnostics Inc.*, 6 U.S.P.Q.2d 1215, 1219 (T.T.A.B. 1988); *see also Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 395 (7th Cir. 1992) ("[A]pplication of the doctrine requires a showing that the family feature or 'surname' is distinctive enough to trigger recognition 'in and of itself.'") (citation omitted).  Here, the record establishes that "zero," if not generic, is so highly descriptive that it cannot, standing alone, function as a distinguishing trademark feature.  *See, e.g.*, *Specialty Brands, Inc. v. Coffee Bean Distribs., Inc.*, 220 U.S.P.Q. 1072, 1075 (T.T.A.B. 1983) ("[G]iven the generic nature of the word 'SPICE' as applied opposer's spices and the descriptive nature of the term as applied to at least some of opposer's teas, proof of a family of marks founded upon the word 'SPICE' is an untenable proposition.").

[11]   The Board's opinion pictured one advertisement which depicted three of TCCC's ZERO-named products, plucked from one of TCCC's Lanham Act Section 2(f) submissions to the USPTO.  (Appx24.)  However, there is nothing in the record to show when, where or even if this advertisement was ever disseminated.  It should not have been relied on by the Board for any purpose.

the recent case of *In re Louisiana Fish Fry Products, Ltd.*, 797 F.3d 1332 (Fed. Cir. 2015), this Court held that evidence relating to use of the mark LOUISIANA FISH FRY PRODUCTS was insufficient to show that the FISH FRY PRODUCTS portion of the mark had independently acquired distinctiveness.  In arriving at that conclusion, this Court noted that the phrase FISH FRY PRODUCTS was highly descriptive, 797 F.3d at 1337, much like the term "zero" here (if it is not, instead, generic).

However, the Board never explained the legal basis on which it determined that the "zero" portion of TCCC's marks had acquired distinctiveness.  Without this explanation, it is impossible to determine whether the Board weighed the evidence correctly, whether the Board applied the law correctly, or whether the Board came to the right conclusion.  Thus, this case should be remanded for an explanation of the legal basis on which the Board concluded that TCCC had acquired distinctiveness in the term "zero" despite never having used ZERO as a stand-alone trademark and despite not have established a family of ZERO-inclusive marks.

## VIII.    CONCLUSION

The Board seems to have forgotten what a trademark is, and what registration requires.  "[T]o qualify for registration the asserted mark must be a 'trademark' in the two-fold sense of (a) identifying the user's goods and (b)

46

distinguishing such goods from those of others." *In re G.D. Searle & Co.*, 360 F.2d 650, 652 (C.C.P.A. 1966).

The evidence in the record shows that the "zero" portion of TCCC's marks serves neither of these functions, and the Board's conclusion to the contrary was in error. The Board's decision that the term "zero" is not generic in relation to soft drinks resulted from holding Royal Crown to an incorrect standard of law, improperly considering TCCC's sales volumes of ZERO-named soft drinks, and then improperly disregarding or discounting probative evidence. The Board's conclusion that TCCC had acquired distinctiveness in "zero" resulted from an incorrect weighing of the uncontroverted evidence of 32 competitive soft drink products in the market with ZERO in their names and is marred by being unsupported by any explanation or citation to case law that would clarify how TCCC acquired rights to "zero" when it neither used ZERO as a stand-alone mark nor showed that it had a family of ZERO-inclusive marks.

For all the reasons discussed herein, the Board's numerous errors require that the Board's decision be reversed and this be case remanded for a proper analysis of the record under the correct legal standard.

Dated:  New York, New York
        November 17, 2016

Respectfully submitted.

FROSS ZELNICK LEHRMAN &
ZISSU, P.C.

By:   /s/ Laura Popp-Rosenberg
      Laura Popp-Rosenberg
      Barbara A. Solomon
      Emily Weiss
866 United Nations Plaza
New York, New York 10017
Tel:  (212) 813-5900
Fax:  (212) 813-5910
lpopp-rosenberg@fzlz.com
bsolomon@fzlz.com
eweiss@fzlz.com

*Attorneys for Appellant*

{F2096814.2 }

**ADDENDUM**

> **This Opinion is Not a
> Precedent of the TTAB**

Hearing:                                                          Mailed:
December 8, 2015                                      May 23, 2016

### UNITED STATES PATENT AND TRADEMARK OFFICE
_____

### Trademark Trial and Appeal Board
_____

*Royal Crown Company, Inc. and Dr Pepper/Seven Up, Inc.*
*v.*
*The Coca-Cola Company*
_____

Opposition Nos. 91178927 (Parent Case); 91180771; 91180772; 91183482;
91185755; 91186579; 91189847; and 91190658[1]
_____

*The Coca-Cola Company*
*v.*
*Royal Crown Company, Inc. and Dr Pepper/Seven Up, Inc.*
_____

Opposition No. 91184434[2]
_____

Barbara A. Solomon, Laura Popp-Rosenberg, and Emily Weiss of Fross Zelnick Lehrman & Zissu, P.C., for Royal Crown Company, Inc. and Dr Pepper/Seven Up, Inc.

Bruce W. Baber, Kathleen E. McCarthy, and Emily B. Brown of King & Spalding LLP for The Coca-Cola Company.
_____

Before Zervas, Hightower, and Lynch,
      Administrative Trademark Judges.

---

[1] Consolidated on February 29, 2008; June 30, 2008; October 17, 2008; June 2, 2009; and June 18, 2009.

[2] Consolidated on October 17, 2008.

Opposition Nos. 91178927 et al.

Opinion by Hightower, Administrative Trademark Judge:

In these consolidated proceedings, Opposers Royal Crown Company, Inc. and Dr Pepper/Seven Up, Inc. (collectively, "RC" or "Opposers") oppose registration of 17 applications by The Coca-Cola Company ("TCCC" or "Applicant") to register marks incorporating the term ZERO. RC asserts that ZERO is either generic for zero-calorie soft drinks or descriptive without acquired distinctiveness and thus cannot be registered without a disclaimer of TCCC's exclusive right in that term.

TCCC, in turn, opposes registration by RC of two marks incorporating the term ZERO on the ground that they are likely to cause confusion with its ZERO-formative marks.

Both parties filed briefs, and each was represented by counsel at an oral hearing held before this panel on December 8, 2015.

The oppositions are sustained in part and dismissed in part, as explained fully *infra.*

## I.    Involved Applications

The 19 applications at issue in these proceedings are:[3]

| Opposition No. | Application No. | Mark | Filed/ Basis | First Use | Goods (all in Class 32) |
|---|---|---|---|---|---|
| 91180771 | 78316078 | SPRITE ZERO | Oct. 20, 2003 1(b) | Sept. 13, 2004 | Beverages, namely carbonated soft drinks; syrups, concentrates and powders for making same |

[3] First use dates listed are those claimed in applications filed pursuant to Section 1(a) of the Trademark Act, or in statements of use for applications filed under Section 1(b) (intent-to-use). No statement of use has been submitted for the nine applications listed in the chart as filed pursuant to Section 1(b) for which the "First Use" date cell is blank. First use dates established by other evidence are discussed in the text where relevant. As noted, the marks COKE ZERO ENERGY and COKE ZERO BOLD have not been used.

Opposition Nos. 91178927 et al.

| Opposition No. | Application No. | Mark | Filed/ Basis | First Use | Goods (all in Class 32) |
|---|---|---|---|---|---|
| 91178927 | 78580598 | COCA-COLA ZERO | March 4, 2005 1(b) | June 13, 2005 | Beverages, namely soft drinks; syrups and concentrates for the making of the same |
| 91186579 | 78620677 | FANTA ZERO | May 2, 2005 1(b) | | Beverages, namely, soft drinks, syrups and concentrates for the making of the same |
| 91180772 | 78664176 | COKE ZERO | July 6, 2005 1(a) | June 13, 2005 | Beverages, namely soft drinks; syrups and concentrates for the making of the same |
| 91190658 | 78698990 | VAULT ZERO | Aug. 24, 2005 1(b) | Dec. 2, 2005 | Non-alcoholic beverages, namely, soft drinks and energy drinks; syrups and concentrates for making soft drinks and energy drinks |
| 91183482 | 77097644 | PIBB ZERO | Feb. 2, 2007 1(a) | July 2005 | Non-alcoholic beverages, namely, soft drinks and concentrates for the making of the same |
| 91185755 | 76674382 | COKE ZERO ENERGY | March 22, 2007 1(b) | Has not been used | Non-alcoholic beverages, namely, soft drinks and energy drinks; syrups and concentrates for making soft drinks and energy drinks |
| 91185755 | 76674383 | COKE ZERO BOLD | March 22, 2007 1(b) | Has not been used | Non-alcoholic beverages, namely, soft drinks and energy drinks; syrups and concentrates for making soft drinks and energy drinks |
| 91183482 | 77175066 | COKE CHERRY ZERO | May 8, 2007 1(a) | Jan. 29, 2007 | Non-alcoholic beverages, namely, soft drinks |
| 91183482 | 77175127 | CHERRY COCA-COLA ZERO | May 8, 2007 1(b) | | Non-alcoholic beverages, namely, soft drinks |

Opposition Nos. 91178927 et al.

| Opposition No. | Application No. | Mark | Filed/ Basis | First Use | Goods (all in Class 32) |
|---|---|---|---|---|---|
| 91185755 | 77176099 | VANILLA COKE ZERO | May 9, 2007 1(b) | | Non-alcoholic beverages, namely, soft drinks; syrups and concentrates for making non-alcoholic beverages, namely, soft drinks |
| 91183482 | 77176108 | COCA-COLA VANILLA ZERO | May 9, 2007 1(b) | | Non-alcoholic beverages, namely, soft drinks |
| 91183482 | 77176127 | CHERRY COKE ZERO | May 9, 2007 1(b) | | Non-alcoholic beverages, namely, soft drinks; concentrates for making non-alcoholic beverages, namely, soft drinks |
| 91183482 | 77176279 | COCA-COLA CHERRY ZERO | May 9, 2007 1(a) | Jan. 29, 2007 | Non-alcoholic beverages, namely, soft drinks; syrups and concentrates for making non-alcoholic beverages, namely, soft drinks |
| 91186579 | 77257653 | VANILLA COCA-COLA ZERO | Aug. 17, 2007 1(b) | | Non-alcoholic beverages, namely, soft drinks |
| 91186579 | 77309752 | POWERADE ZERO | Oct. 22, 2007 1(b) | May 2008 | Non-alcoholic beverages, namely, sports drinks |
| 91189847 | 77413618 | FULL THROTTLE ZERO | March 5, 2008 1(b) | | Non-alcoholic beverages, namely, energy drinks |
| 91184434 | 78576257 | DIET RITE PURE ZERO | Feb. 28, 2005 1(b) | | Soft drinks and syrups used in the preparation thereof |
| 91184434 | 78581917 | PURE ZERO | March 7, 2005 1(b) | | Soft drinks, and syrups and concentrates used in the preparation thereof |

All marks are in standard characters. TCCC claims acquired distinctiveness in the term ZERO in each of the marks it seeks to register and in COKE ZERO as a

Opposition Nos. 91178927 et al.

whole. TCCC disclaims the terms CHERRY, VANILLA, and ENERGY from the marks in which these terms appear.

In its two applications, listed last in the chart *supra*, RC disclaims ZERO apart from the marks DIET RITE PURE ZERO and PURE ZERO as a whole.

II.    Evidentiary Objections and Record

On an evidentiary record comprising more than 5,700 pages (excluding the file histories of the 19 subject applications, which are automatically of record), the parties have devoted 108 pages – many in the form of single-spaced charts – to their statements of objections, responses, and replies.[4] We have considered all objections. On the whole, the disproportionate volume of the parties' submissions does not reflect the gravity of their objections, most of which actually concern the weight due the evidence rather than its admissibility. Lest we devote a similarly excessive number of pages to ruling on these objections individually, we address here only certain evidence that could be material to our outcome-determinative findings of fact. Otherwise, we have kept the objections in mind in considering the evidence, and comment as needed on its probative value elsewhere in the opinion. *See Kohler Co. v. Baldwin Hardware Corp.*, 82 USPQ2d 1100, 1104 (TTAB 2007). We also urge the parties to remember that our proceedings are tried before judges not likely to be easily confused or prejudiced and lodge their objections more judiciously in future proceedings.

---

[4] 146, 151, 152, 155, 156, and 160 TTABVUE. Citations to the record are to the TTABVUE docket history system. Parties also are encouraged to cite to evidence in TTABVUE. TBMP § 801.03 (2015); *Turdin v. Trilobite, Ltd.*, 109 USPQ2d 1473, 1476 n.6 (TTAB 2014).

Opposition Nos. 91178927 et al.

The following evidence is excluded from the trial record: Because foreign trademark registration is irrelevant to the registrability of TCCC's marks in the United States, we grant TCCC's motion to exclude what RC characterizes as decisions from the United Kingdom rejecting TCCC's application to register ZERO as a mark because it is generic for beverages.[5] *See, e.g., Double J of Broward Inc. v. Skalony Sportswear GmbH*, 21 USPQ2d 1609, 1612 (TTAB 1991).

Both parties objected to some advertisements introduced through witnesses who testified that they were not certain the ads had appeared publicly. Although we do not exclude them, we give no weight to such advertisements. *See, e.g., Wet Seal Inc. v. FD Mgmt. Inc.*, 82 USPQ2d 1629, 1637 (TTAB 2007). Such ads specifically include TCCC Exhibits 118 through 121 to the testimony deposition of Russell Baker, who testified on cross-examination that he did not know whether the ads were ever deployed in the marketplace.[6] We disagree with TCCC that "it does not matter whether he knows if the specific documents were ever deployed" because they were

---

[5] Exhibits RC 282-83 to Opposer's Notice of Reliance on Official Records, 102 TTABVUE 1042-87. RC contends that TCCC's own statement during prosecution has made these decisions relevant, but arguments concerning foreign registration also are irrelevant.

[6] Baker Tr. at 141:9-148:6, 232:18-237:2, 168 TTABVUE 139-46, 230-35, 278-82 (exhibits). Mr. Baker explained that knowledge of the retail execution specifics was lacking because TCCC's bottling organization deploys these types of materials. *Id.* at 144:22-146:21, 168 TTABVUE 142-44. Consistent with this testimony, in its Supplemental Response to RC's Interrogatory No. 8, which sought specific information concerning "all advertising, marketing and promotional campaigns or activities that have included more than one of TCCC's Marks," TCCC stated in part that "while TCCC has generated various advertisements that have been released for use by retailers, customers and others in print and/or outdoor media and that show and could be used to advertise multiple products bearing TCCC's ZERO Marks, as shown in the documents previously produced to RC, TCCC does not receive or maintain information regarding the specific uses made of such advertisements, including the specific media outlets, time frames or geographic areas in which such materials are used." Opposer's Second Notice of Reliance on Discovery Responses, Exhibit RC 302, 118 TTABVUE 73-78.

Opposition Nos. 91178927 et al.

"representative of the kinds of promotions TCCC did for more than one ZERO product" one to two years later.[7] Although parties are permitted to produce representative samples of information sought in discovery requests, *see Carefirst of Maryland Inc. v. FirstHealth of the Carolinas Inc.*, 77 USPQ2d 1492, 1499-1500 (TTAB 2005), *aff'd*, 479 F.3d 825, 81 USPQ2d 1919 (Fed. Cir. 2007); Trademark Trial and Appeal Board Manual of Procedure (TBMP) § 414(2) (2015), we find these specific advertisements to have no probative value in the absence of evidence that they ran.

Similarly, we give no weight to Exhibit RC 18 to the Trial Declaration of Chris Barnes, who could testify neither that the graphics shown in the exhibit were actually used as subway advertising nor that they were approved by the companies represented in the ads – including TCCC – other than his own employer (Dr Pepper Snapple Group).[8]

    A.    RC's Evidence

Opposers submitted the following evidence:

- Opposer's Notice of Reliance, with the following exhibits:

    o Stipulated documents,[9] including, e.g., press releases, advertising and marketing materials, printouts from websites and TTAB proceedings, and copies of settlement agreements between TCCC and third parties (Exhibits RC 56-101, 94 TTABVUE);

---

[7] TCCC's Response to RC's Statement of Objections at 15, 151 TTABVUE 16.

[8] *See* Trial Declaration of Chris Barnes at ¶ 9, Barnes Tr. at 25:10-26:16, 36:23-37:3, 44:25-45:9, 131 TTABVUE 7 (declaration), 10-12 (exhibit), 37-38, 48-49, 56-57 (testimony).

[9] The parties entered into a "Stipulation Regarding Authentication and use of Documentary Evidence at Trial," pursuant to which they authenticated and identified particular produced documents and agreed that business records would not be subject to hearsay objection. 87 TTABVUE; approved by Board at 90 TTABVUE.

Opposition Nos. 91178927 et al.

- o Discovery responses, including TCCC responses to RC's interrogatories and requests for admission (Exhibits RC 120-125, 98 and 136 TTABVUE);

- o Excerpts from the discovery deposition testimony of TCCC witnesses William Herbert Gray IV, Russell Wiley Baker ("Baker Discovery Tr."), and Maurice Cooper II, with exhibits (Exhibits RC 126-28, 99-100 TTABVUE);

- o Printed publications, including printouts from the websites of third parties and Opposers and media references (Exhibits RC 129-91, 101 TTABVUE);

- o Official records of the U.S. Patent and Trademark Office ("USPTO"), in particular, applications, registrations, and prosecution history for marks containing the term ZERO for beverage goods, including Opposers' pleaded marks and an abandoned application by TCCC for the mark , as well as oppositions to third-party ZERO marks filed by TCCC (Exhibits RC 192-281, 102 TTABVUE);

- The testimony deposition transcript of Robert Marciano, executive vice president, chief sales and marketing officer for Arizona Beverages USA, LLC, who appeared by subpoena, with exhibits (114-15 TTABVUE);

- The trial declaration and transcript of the cross-examination of Mario Ortiz, a paralegal for Opposers' counsel, with exhibits (116 and 130 TTABVUE);[10]

- Opposer's Second Notice of Reliance, with the following exhibits:

  - o Discovery responses, including additional TCCC responses to RC's interrogatories and requests for admission (Exhibits RC 299-302 and 304 (Supplemental Response to Request No. 26),[11] 118 TTABVUE);

  - o Additional excerpts from discovery deposition testimony of TCCC witnesses William Herbert Gray IV, Russell Wiley Baker, and Maurice Cooper II, and RC witnesses Andrew David Springate, Russell Schleiden, and Tony Jacobs, with exhibits (Exhibits RC 306-08 and RC 314-16, 119 and 121-23 TTABVUE);

---

[10] The parties stipulated to enter direct trial testimony of party and counsel employees by sworn declaration or affidavit, subject to oral cross-examination. 89 TTABVUE; approved by Board at 90 TTABVUE.

[11] RC also submitted certain other of TCCC's responses to document requests, but they generally are not admissible by notice of reliance except when the responses are objections or statements that no such documents exist. *Hunter Indus., Inc. v. Toro Co.*, 110 USPQ2d 1651, 1657 n.13 (TTAB 2014). The stipulations between the parties did not cover responses to document requests, only produced documents proposed for use at trial.

Opposition Nos. 91178927 et al.

   o Additional printed publications, including printouts from the
     websites of third parties (Exhibits RC 309-13, 120 TTABVUE);

• The trial declaration and transcript of the cross-examination of Chris
  Barnes, director, corporate communications, Dr Pepper Snapple Group,
  with exhibits ("Barnes Tr.," 131 TTABVUE);

• The transcript of the testimony deposition of Christopher John Reed, CEO
  of Reed's, Inc., with exhibits (132-33 TTABVUE);

• Two trial declarations and transcripts of two cross-examinations of Andrew
  D. Springate, senior vice-president, marketing services and long-range
  planning, Dr Pepper Snapple Group, with exhibits (134-35 and 139-40
  TTABVUE);

• The transcript of the testimony deposition of Esperanza Teasdale, senior
  director of marketing for PepsiCo, with exhibits (137-38 TTABVUE);

• A CD with a 30-second advertisement for RC's DIET RITE PURE ZERO
  cola (Exhibit RC 7, 141 TTABVUE); and

• The transcript of the testimony deposition of Harold Miller, owner and
  managing member of Southern Group Enterprises, Inc., with exhibits (142-
  43 TTABVUE).

B.   TCCC's Evidence

Applicant submitted the following evidence:

• Applicant's Notice of Reliance, with the following exhibits:

   o Additional excerpts from discovery deposition testimony of TCCC
     witnesses William Herbert Gray IV, Russell Wiley Baker, Maurice
     Cooper II, and RC witnesses Andrew David Springate, Russell
     Schleiden, and Tony Jacobs, with exhibits (106-09 and 111-12
     TTABVUE);

   o Official USPTO records, including documents relating to third-party
     applications and oppositions filed by TCCC, both for marks
     incorporating the term ZERO or the numeral "0" (TCCC Exhibits
     206-61, 110 and 117 TTABVUE);

   o Printed publications, including TCCC press releases and articles
     from print and electronic publications (TCCC Exhibits 262-79, 110
     TTABVUE);

Opposition Nos. 91178927 et al.

- o Discovery responses, including RC responses to TCCC's requests for production and interrogatories[12] (TCCC Exhibits 280-81, 110 TTABVUE); and

- o Third-party registrations (TCCC Exhibits 282-304, 110 TTABVUE);

- Applicant's Second Notice of Reliance, with additional excerpts from discovery deposition testimony of TCCC witnesses William Herbert Gray IV, Russell Wiley Baker, and Maurice Cooper II (124-26 TTABVUE);

- The testimony deposition transcript of Dr. Alexander Simonson, who conducted a secondary meaning survey on TCCC's behalf in 2008, with exhibits ("Simonson Tr.," 167 TTABVUE); and

- The testimony deposition transcript of Russell Wiley Baker, vice president of sales capabilities for the Coca-Cola Refreshments Business Unit of TCCC, with exhibits ("Baker Tr.," 168-69 TTABVUE).

The parties have designated much of the evidence as confidential. We have endeavored not to divulge information that the parties have maintained as confidential and not disclosed in their public briefs.

## III. Standing

Standing is a threshold issue that must be proven by the plaintiff in every *inter partes* case. *See Empresa Cubana Del Tabaco v. Gen. Cigar Co.*, 753 F.3d 1270, 111 USPQ2d 1058, 1062 (Fed. Cir. 2014); *John W. Carson Found. v. Toilets.com Inc.*, 94 USPQ2d 1942, 1945 (TTAB 2010).

Neither party contests the other's standing. Ample record evidence demonstrates that the parties are competitors in the soft drink industry and have trademark applications pending for marks including the same disputed term. Thus, the parties presumptively have an interest in the outcome of these consolidated proceedings

---

[12] As noted in n.11 *supra*, only RC's responses to document requests consisting of objections or statements that no such documents exist are of record, i.e., responses to Requests No. 9-10, 14, 16-18, 21-23, and 28. *See* 110 TTABVUE 435-52.

Opposition Nos. 91178927 et al.

beyond that of the public in general. *Books on Tape Inc. v. Booktape Corp.*, 836 F.2d 519, 5 USPQ2d 1301, 1302 (Fed. Cir. 1987); *Plyboo Am. Inc. v. Smith & Fong Co.*, 51 USPQ2d 1633, 1634 (TTAB 1999); *Fed. Glass Co. v. Corning Glass Works*, 162 USPQ 279, 282-83 (TTAB 1969). We find that each party has proven its standing.

## IV.  Burdens of Proof

The parties disagree as to certain of the applicable burdens of proof. RC bears the burden of proving genericness as plaintiff in its oppositions. *Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*, 786 F.3d 960, 114 USPQ2d 1827, 1830 & n.2 (Fed. Cir. 2015). It is TCCC, however, that bears the burden of proof of acquired distinctiveness in the term ZERO so as to be entitled to registration under the provisions of Section 2(f) of the Trademark Act. *Yamaha Int'l Corp. v. Hoshino Gakki Co.*, 840 F.2d 1572, 6 USPQ2d 1001, 1006 (Fed. Cir. 1988). TCCC also bears the burden of proving that RC's ZERO marks are likely to cause confusion with TCCC's ZERO marks as plaintiff in its opposition. *Yamaha*, 6 USPQ2d at 1007. The standard of proof for genericness, acquired distinctiveness, and likelihood of confusion is a preponderance of the evidence. Nonetheless, "the applicant's burden of showing acquired distinctiveness increases with the level of descriptiveness; a more descriptive term requires more evidence of secondary meaning." *In re Steelbuilding.com*, 415 F.3d 1293, 75 USPQ2d 1420, 1424 (Fed. Cir. 2005).

## V.  Genericness

We first consider RC's challenge to registration of TCCC's marks on the ground that they are unregistrable without disclaimer of the generic term ZERO. As the Court of Appeals for the Federal Circuit, our primary reviewing court, has explained:

Opposition Nos. 91178927 et al.

> A generic term "is the common descriptive name of a class of goods or services." *H. Marvin Ginn Corp. v. Int'l Ass'n of Fire Chiefs, Inc.*, 782 F.2d 987, 989 [228 USPQ 528, 530] (Fed. Cir. 1986). Because generic terms "are by definition incapable of indicating a particular source of the goods or services," they cannot be registered as trademarks. *Dial-A-Mattress* [*Operating Corp.*, 240 F.3d 1341, 1344, 57 USPQ2d 1807, 1810 (Fed. Cir. 2001)]. "The critical issue in genericness cases is whether members of the relevant public primarily use or understand the term sought to be protected to refer to the genus of goods or services in question." *Marvin Ginn*, 782 F.2d at 989-90.
>
> We have said that determining a mark's genericness requires "a two-step inquiry: First, what is the genus of goods or services at issue? Second, is the term sought to be registered or retained on the register understood by the relevant public primarily to refer to that genus of goods or services?" *Id.* at 990. Evidence of the public's understanding of the mark may be obtained from "any competent source, such as consumer surveys, dictionaries, newspapers and other publications." *In re Northland Aluminum Prods., Inc.*, 777 F.2d 1556, 1559 [227 USPQ 961] (Fed. Cir. 1985).

*Princeton Vanguard*, 114 USPQ2d at 1830.

### A. Genus of TCCC's Goods

The parties disagree as to the genus of the goods at issue. TCCC argues that the genus is carbonated soft drinks, energy drinks, and sports drinks (and syrups and concentrates for making such drinks), as identified in its applications. RC contends that because the identified goods "encompass zero-calorie soft drinks, the Board must consider whether 'ZERO' is generic for zero-calorie soft drinks."[13]

The genus of the goods is determined by focusing on the identification of goods in the subject applications. *See In re Cordua Rests., Inc.*, No. 2015-1432, --- USPQ2d ----, 2016 WL 2786364, at *4 (Fed. Cir. May 13, 2016); *Magic Wand Inc. v. RDB Inc.*, 940 F.2d 638, 19 USPQ2d 1551, 1552 (Fed. Cir. 1991); *Sheetz of Del., Inc. v. Doctor's*

---

[13] RC Brief at 36, 145 TTABVUE 38.

Opposition Nos. 91178927 et al.

*Assocs. Inc.*, 108 USPQ2d 1341, 1350 (TTAB 2013). As we have previously observed in determining the genus for a genericness inquiry, a product may be in more than one category. *In re Central Sprinkler Co.*, 49 USPQ2d 1194, 1197 (TTAB 1998).

Here, TCCC's goods fall into the broad category of soft drinks (and sports and energy drinks), which encompasses the narrower category of soft drinks (and sports and energy drinks) containing minimal or no calories.[14] *See Alcatraz Media Inc. v. Chesapeake Marine Tours Inc.*, 107 USPQ2d 1750, 1761 (TTAB 2013) (for mark ANNAPOLIS TOURS, finding services identified as "conducting guided tours of historic districts and other areas of cities" adequately defined genus and were sufficiently broad to include tours of the city of Annapolis), *aff'd*, 565 Fed. Appx. 900 (Fed. Cir. 2014). Therefore, we find that the identifications in TCCC's applications adequately define the genus of the goods at issue as soft drinks, sports drinks, and energy drinks. In accordance with the bulk of the record evidence, we focus our analysis on these goods rather than the remaining identified goods – syrups, concentrates, and powders for making soft drinks – but note that registration is properly refused even if a term in an applied-for mark is generic for fewer than all identified goods and not disclaimed. *See Cordua Rests.*, 2016 WL 2786364, at *7 ("But a term is generic if the relevant public understands the term to refer to part of the claimed genus of goods or services, even if the public does not understand the term to

---

[14] "Zero-calorie" beverages do not necessarily have zero calories. One of RC's witnesses testified that "any beverage that has fewer than five calories per serving is permitted to signify the number of calories on the nutritional panel as '0.'" Springate Decl. at ¶ 31 n.2, 134 TTABVUE 14 (filed under seal); RC Reply Brief at 23 n.10, 157 TTABVUE 24 (citing declaration and quoting 21 C.F.R. § 101.9(c)(1)).

- *13* -

Opposition Nos. 91178927 et al.

refer to the broad genus as a whole."); *In re Analog Devices Inc.*, 6 USPQ2d 1808, 1810

(TTAB 1988), *aff'd*, 871 F.2d 1097, 10 USPQ2d 1879 (Fed. Cir. 1989).

    B. Is ZERO Understood by the Relevant Public Primarily to Refer to Soft
       Drinks, Energy Drinks, or Sports Drinks, Particularly Those With Zero or
       Near Zero Calories?

Because there are no restrictions or limitations to the channels of trade or classes

of consumers in the opposed applications, we find the relevant consuming public to

be ordinary consumers who purchase and drink soft drinks, energy drinks, or sports

drinks.

We turn once again to the decision in *Princeton Vanguard*, 114 USPQ2d at 1833,

to provide the framework for the second step of our genericness inquiry:

> As previously discussed, the relevant public's perception is the
> primary consideration in determining whether a term is generic. *In re
> Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 828 F.2d 1567, 1569 [4
> USPQ2d 1141] (Fed. Cir. 1987) ("It is basic to the inquiry to determine
> whether members of the relevant public primarily use or understand the
> term to refer to the genus of goods or services."). And, as noted, evidence
> of the public's perception may be obtained from "any competent source,
> such as consumer surveys, dictionaries, newspapers and other
> publications." *Northland Aluminum*, 777 F.2d at 1559.
>
> One of our sister circuits has indicated that "direct consumer evidence,
> e.g., consumer surveys and testimony is preferable to indirect forms of
> evidence." *Berner Int'l Corp. v. Mars Sales, Co.*, 987 F.2d 975, 982-83 [26
> USPQ2d 1044] (3d Cir. 1993) ("Consumer surveys have become almost
> de rigueur in litigation over genericness.") (internal citation and
> quotation marks omitted). We likewise have recognized that "consumer
> surveys may be a preferred method of proving genericness." *BellSouth
> Corp. v. DataNational Corp.*, 60 F.3d 1565, 1570 [35 USPQ2d 1554]
> (Fed. Cir. 1995) ("While consumer surveys may be a preferred method of
> proving genericness under the proper test of purchaser understanding,
> we are satisfied that on the facts of this case genericness has been
> established under that test.").

*See also Glover v. Ampak Inc.*, 74 F.3d 57, 37 USPQ2d 1602, 1603 (4th Cir. 1996)

(stating that evidence of genericness may come from purchaser testimony, consumer

Opposition Nos. 91178927 et al.

surveys, listings and dictionaries, trade journals, newspapers, and other publications, and: "Only by showing that the public understands by the mark the class of goods or services of which the trademarked product or service is a part can the party who seeks to cancel a registration carry its burden.").

RC has provided no direct consumer evidence in the form of surveys or testimony. Nor is there any dictionary evidence associating ZERO with soft drinks. RC has provided indirect evidence to support its contention that the relevant purchasing public primarily uses or understands ZERO to refer to the genus of soft drinks, energy drinks, or sports drinks, in particular such drinks with zero calories. After carefully reviewing the record as a whole, we find that its evidence does not establish that the relevant purchasing public primarily uses or understands ZERO to refer to the genus of such goods.

We will briefly address the record evidence relevant to our findings as categorized by RC, which grouped its discussion of public understanding of the term ZERO in the argument section of its trial brief under the headings "Competitors Use 'Zero' Generically," "Competitors Use 'Zero' Generically in Trademark Applications and Registrations," "Consumers Use 'Zero' to Refer to a Category of Beverages," and "TCCC Itself Uses 'Zero' Generically."

    1.   Competitor Use of ZERO

We note at the outset that, because TCCC seeks registration under Section 2(f), it is an established fact that ZERO is not inherently distinctive in association with soft drinks, energy drinks, and sports drinks. *Cold War Museum Inc. v. Cold War Air Museum Inc.*, 586 F.3d 1352, 92 USPQ2d 1626, 1629 (Fed. Cir. 2009); *Yamaha*, 6

- 15 -

Opposition Nos. 91178927 et al.

USPQ2d at 1005. Some of the uses by competitors on which RC relies is merely additional evidence that the word ZERO and numeral 0 are descriptive and, as TCCC argues, may be used to provide information about zero-calorie beverages. This includes use of the numeral 0 on "Nutritional Facts" panels and use of both the word ZERO and numeral 0 in "call-outs" on labeling or packaging to indicate that a product has zero calories. Evidence that the term conveys information about the goods to consumers does not render it generic. While such uses provide information about the products, they do not demonstrate use of ZERO to name a category of goods.

More persuasive is the use of ZERO in product names by competitors, including RC, which has sold its DIET RITE PURE ZERO since 2005.[15] RC also submitted evidence of the existence of some 27 third-party zero-calorie soft drinks, sports drinks, and energy drinks with names that incorporate ZERO, as follows:

> All Sport Zero, Diet Crisp Zero, Monster Energy Zero Ultra, Rox Zero,  Pre Zero, Runa Zero, Beast Zero, Holistics Zero, Pomberry Zero, Sodastream Zero Cola, Big Red Zero, Propel Zero, Sqwincher Zero, Blue Sky Zero, Impulse Zero, Red Bull Total Zero, Victory Zero, Bubba Zero, Jones Whoopass Zero, Roaring Lion Zero, Virgil's Zero,  Caballa Negro Zero, Rob's Really Good Zero, Vita Rain Zero, Clearly Zero, Monster Energy Absolutely Zero, Rockstar Pure Zero.[16]

Nonetheless, we do not find that the record evidence rises to a level sufficient to support a finding that ZERO is a generic name for types of beverages. *Cf. Sheetz*, 108

---

[15] Springate Decl. ¶ 11, 139 TTABVUE 8.

[16] *See* RC Brief at 26, 145 TTABVUE 28. We omit the following because they are not used for soft drinks, sports drinks, or energy drinks, including the "zero-calorie soft drinks" that RC asserts as the relevant genus: Arnold Palmer Zero, Icee Zero, and two margarita mixes, Margarita Zero and Zero Margarita Mix.

Opposition Nos. 91178927 et al.

USPQ2d at 1357 (stating that extensive use of the term FOOTLONG by competitors offering identical goods to denote a type of sandwich is evidence of genericness).

Although we will not specifically discuss the data because it was filed under seal, RC introduced sales data for the 52 weeks ending March 23, 2013, for products with ZERO in the name, including some of those listed *supra*.[17] Other than RC's product, there appear to be no soft drinks with ZERO in the name except TCCC's that are listed as having sales. With the significant exceptions of MONSTER ABSOLUTELY ZERO energy drinks and PROPEL ZERO enhanced waters,[18] for most third-party sports drinks and energy drinks with ZERO in the name listed in this data, both the total sales and percentage of stores selling the goods were very low.

Although record evidence shows that third parties do use the term ZERO in association with goods relevant to our inquiry, the overall use appears to be relatively minor in comparison to TCCC's, representing a small fraction of TCCC's use of the term for its goods. Crucially, moreover, there is nothing to link the third-party uses to evidence that the public "primarily uses or understands the term [ZERO] to refer to the genus of goods or services," that is, as the ***name of a category*** of sports,

---

[17] Springate Decl. ¶ 35 & Exhibit RC 17, 134 TTABVUE 15, 30.

[18] RC also submitted (under seal) evidence indicating a large volume of sales and advertising for PROPEL ZERO, zero-calorie "nutrient enhanced water beverages" and powder packets offered by PepsiCo. However, TCCC suggests, and evidence the parties designated confidential supports, that "enhanced water" is a different category from "sports drinks." *See* TCCC Brief at 43, 153 TTABVUE 45. RC argues that "TCCC itself offers a ZERO-named enhanced water product that competes directly with PROPEL ZERO, namely, VITAMINWATER ZERO," but registration of that mark is not before us. RC Reply Brief at 39 n.20, 157 TTABVUE 40.

Opposition Nos. 91178927 et al.

energy, or soft drinks. *Princeton Vanguard*, 114 USPQ2d at 1833. Therefore, we find

that the third-party uses of record do not demonstrate that ZERO is generic.

    2.   Competitor Trademark Applications and Registrations

Third-party registrations may be used to show the sense in which a word is used

in ordinary parlance and whether a particular term has descriptive significance as

applied to certain goods or services. *Institute Nat'l Des Appellations D'Origine v.*

*Vintners Int'l Co.*, 958 F.2d 1574, 22 USPQ2d 1190, 1196 (Fed. Cir. 1992) ("Such third

party registrations show the sense in which the word is used in ordinary parlance

and may show that a particular term has descriptive significance as applied to certain

goods or services."); *General Mills Inc. v. Health Valley Foods*, 24 USPQ2d 1270, 1277

(TTAB 1992).

RC submitted four live registrations for the goods at issue from which the term

ZERO was disclaimed, alone or in combination with other disclaimed words. TCCC,

in turn, submitted one live registration from which the term ZERO was disclaimed

along with other words, and two with no disclaimers. Both parties submitted three

additional live registrations incorporating ZERO.[19] Relevant information from these

10 third-party registrations is summarized in the following chart:

---

[19] Both parties also submitted evidence concerning trademark applications, as well as cancelled and expired registrations. None are probative evidence of the public's understanding of the significance of ZERO today, when we must determine the question of genericness. *See In re Thunderbird Prods. Corp.*, 406 F.2d 1389, 160 USPQ 730, 732 (C.C.P.A. 1969). As we have often said, applications are not evidence of anything except that they were filed. *See, e.g., Weider Publ'ns, LLC v. D&D Beauty Care Co.*, 109 USPQ2d 1347, 1360 (TTAB 2014); *Glamorene Prods. Corp. v. Earl Grissmer Co.*, 203 USPQ 1090, 1092 n.5 (TTAB 1979); TBMP § 704.03(b)(2) & n.3. Cancelled and expired registrations are not evidence of any presently existing rights in the mark shown, or that it was ever used. TBMP § 704.03(b)(1)(A) & n.24.

Opposition Nos. 91178927 et al.

| Party | Mark | Goods (Partial) | Disclaimer | Cite |
|---|---|---|---|---|
| RC |  | Soft drinks carbonated, non-carbonated and cola | "Zero cal" | 102 TTABVUE 144 (Exh. RC 221) |
| RC |  | Energy drinks | "Zero" | 102 TTABVUE 237 (Exh. RC 243) |
| RC | WHOOPASS ZERO | Energy drinks | "Zero" | 102 TTABVUE 264 (Exh. RC 249) |
| RC | IMPULSE ZERO | Beverages, namely energy drinks and sports drinks | "Zero" | 102 TTABVUE 308 (Exh. RC 259) |
| TCCC | JCORE ZERO-LITE | Sports drinks; powders for use in the preparation of isotonic sports drinks and sports beverages | None | 110 TTABVUE 496 (Exh. TCCC 290) |
| TCCC | FOUR POINT ZERO | Non-alcoholic beverages, namely, carbonated beverages; seltzer water | None | 110 TTABVUE 498 (Exh. TCCC 291) |
| TCCC |  | Non-alcoholic beverages, namely, carbonated beverages; seltzer water | "seltzer lemon wedge unsweetened + zero calories clean + crisp + refreshing glass bottled 12 oz/355 ml" | 110 TTABVUE 524 (Exh. TCCC 304) |
| Both | 0 CALORIES 0 SUGAR 0 SODIUM 0 GUILT | Isotonic beverages; isotonic drinks; all the aforementioned goods contain no calories, sugar or sodium | "0 calories 0 sugar 0 sodium" | 102 TTABVUE 204 (Exh. RC 236)<br><br>110 TTABVUE 494 (Ext. TCCC 289) |
| Both |  | Non-alcoholic beverages, namely carbonated beverages | "No-cal zero calorie soda-pop genuine brand" | 102 TTABVUE 105 (Exh. RC 211)<br><br>110 TTABVUE 522 (Exh. TCCC 303) |

Appx19

Opposition Nos. 91178927 et al.

| Party | Mark | Goods (Partial) | Disclaimer | Cite |
|-------|------|-----------------|------------|------|
| Both | ZERO IS GOOD | Non-alcoholic flavored beverages, namely, flavored waters[20] | None | 102 TTABVUE 273 (Exh. RC 251) <br><br> 110 TTABVUE 508 (Exh. TCCC 296) |

RC argues that the registrations "are relevant to show that many companies and individuals have sought to register and use the term or numeral zero in connection with beverage products, thus tending to show that zero (the term or numeral) is diluted, and/or generic, and/or highly descriptive or descriptive for such goods,"[21] and that they show "common acceptance of 'zero' as an industry term."[22] TCCC argues that five of the six registrations listed above that it submitted show that the registration was issued without a disclaimer of ZERO[23] (although the word or numeral was disclaimed in two of the registrations as part of a phrase). With respect



to its Exhibit 303, for the mark          , TCCC argues that the registration "was issued by the USPTO for beverages in International Class 32 with a disclaimer of the word ZERO because ZERO modifies a generic term in the mark," that is, zero calorie.[24] TCCC also points out that RC initially applied to register its marks

---

[20] We include this registration because it was submitted by both parties, but we view its probative value to be very limited because it does not identify goods of the relevant genus, that is, soft drinks, energy drinks, or sports drinks.

[21] Opposer's Notice of Reliance on Official Records, ¶ 1, 102 TTABVUE 1-2; *see also id.* at ¶¶ 2-3, 102 TTABVUE 10-11, 14-15.

[22] RC Brief at 27, 145 TTABVUE 29.

[23] TCCC's Notice of Reliance on Printed Publications, Official Records and Discovery Request Responses at ¶ D, 110 TTABVUE 28-32.

[24] *Id.* at ¶ D(22), 110 TTABVUE 31-32.

Opposition Nos. 91178927 et al.

DIET RITE PURE ZERO and PURE ZERO without disclaiming ZERO, agreeing to disclaim the term on request by the Examining Attorney.[25]

Disclaimers are not limited to generic matter, but also are required for terms that are descriptive. *See* Trademark Act Section 6(a) ("The Director may require the applicant to disclaim an unregistrable component of a mark otherwise registrable."); *In re Louisiana Fish Fry Prods., Ltd.*, 797 F.3d 1332, 116 USPQ2d 1262, 1264 (Fed. Cir. 2015) (distinguishing generic terms from descriptive marks, which can acquire distinctiveness and become registrable on that basis); *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 4 USPQ2d 1793, 1796 & n.1 (Fed. Cir. 1987) (noting that third-party registrations with the term "sweats" disclaimed "are evidence, albeit not conclusive, of descriptiveness of the term").

We find that the third-party registrations of record are as consistent with a conclusion that ZERO is descriptive, rather than generic, as applied to soft drinks, energy drinks, and sports drinks. Once again, TCCC has admitted that ZERO has descriptive significance by asserting its claims of acquired distinctiveness.

3.   Consumer Use of ZERO

The public's perception is the primary consideration in a determination of genericness. *Loglan Inst. Inc. v. Logical Language Group Inc.*, 962 F.2d 1038, 22 USPQ2d 1531, 1533 (Fed. Cir. 1992). As stated *supra*, the relevant consuming public in this case is ordinary consumers who purchase and consume soft drinks, energy drinks, or sports drinks, including such drinks with no or essentially no calories.

---

[25] TCCC Brief at 29, 153 TTABVUE 31.

Opposition Nos. 91178927 et al.

As noted, RC submitted no direct evidence of public perception in the form of contemporary consumer surveys or testimony.[26] Rather, Opposer submitted the following 17 Internet printouts, spanning the years 2008 to 2013, "to demonstrate media and consumer use of the term zero to identify a category of beverage products, thus showing that zero is generic and/or highly descriptive or descriptive of such products:"[27]

1. A tweet stating "is it just me or do diet/'zero' sodas taste a little better when they're just a wee bit warm?" (RC 170, Nov. 30, 2009, http://twitter.com/chrisocallahan);

2. A printout identifying "Diet/Zero Sodas" as a type of "lower calorie beverages" (RC 171, Dec. 7, 2009, www.physiciansregional.net);

3. A message board excerpt stating "Thankfully, artificial sweetners [sic] make me sick so I avoid them anyway! And don't let those so called 'zero' sodas fool you either!" (RC 172, December 2008, www.bitstrips.com);

4. The question: "What kind of zero beverages are there to choose from besides coffee and diet sodas?" and a response on "Active Low-Carber Forums" (RC 173, March 16, 2008, http://forum.lowcarber.org);

5. A video "vlog" posted under the title "Reviewing 'Zero' sodas," stating: "I'm reviewing 'Zero' (as in no carb, no sugar, no calories) sodas, Diet Rite Zero, Sprite Zero, and Coca Cola Cherry Zero." (RC 174, Jan. 11, 2010, http://tinfoilchef.com);

6. A question on a carbonated drink message board regarding "diet sodas, or zero sodas" and a response referencing "diet/zero sodas" and "diet/zero carb soda" (RC 175, Aug. 4-5, 2008, www.bullshido.net);

---

[26] Consumer research TCCC conducted before launching its ZERO products in 2004 (submitted under seal) emphasizes the descriptive nature of the term, as discussed *infra*, but is not probative as to whether ZERO was generic at the time of trial. *See* Opposer's Notice of Reliance on Stipulated Documents, Exhibits RC 95-96, 94 TTABVUE 121-55; Opposer's Notice of Reliance on Deposition Testimony, Exhibit RC 127, Baker Discovery Tr. at 80:18-81:13, 99 TTABVUE 60-61; TCCC Brief at 23 n.8, 153 TTABVUE 25.

[27] Opposer's Notice of Reliance on Printed Publications at ¶ 2 & Exhibits RC 170-86, 101 TTABVUE 8-11, 220-311. Where available, the date listed reflects when the material was posted online rather than the date it was printed.

Opposition Nos. 91178927 et al.

7. The question: "What is the difference between zero drinks and diet drinks?" with the answer: "Zero means Zero calories Diet means less calories" (RC 176, April 27, 2010, http://wiki.answer.com);

8. A post titled "Great Diet Drinks with Little to No Carbs" stating in part: "If you are a soda lover like myself, then you do have alternatives to regular calorie and carb filled soda. Pepsi and Coke products have came [sic] out with their Zero soda. It has zero carbs, zero sugar, and zero calories. Most of the Zero sodas, especially Sprite, taste just like the regular version." (RC 177, June 16, 2009, www.associatedcontent.com);

9. A comment on Yahoo! Answers about sugar free drinks contrasting "Diet ('zero') sodas" with "'Sugar' sodas" (RC 178, Sept. 25, 2009, http://answers.yahoo.com);

10. An article about the beverage product PROPEL ZERO, which begins: "Propel is remaking itself as a Zero." (RC 179, March 17, 2011, http://adage.com);

11. A message board with the topic "Zero Sodas?," including three posts mentioning Coke Zero (RC 180, May 17-19, 2011, www.sparkpeople.com);

12. A story from the Dayton Daily News titled "Experts: Drinks have health consequences," which states that "Soda comes in different forms, with titles including: 'regular,' 'diet' and 'zero,'" but capitalizes "Zero" throughout the remainder of the article (RC 181, June 20, 2012, www.daytondailynews.com);

13. Five answers to the question "How come those ZERO sodas don't have any calories?" with two referencing "zero sodas" (RC 182, 2010, http://answers.yahoo.com);

14. A body building forum with a message thread titled "How many diet/zero sodas in a day?" (RC 183, Sept. 1, 2011, http://forum.bodybuilding.com);

15. A "Trying To Conceive" message board with the topic "'Zero' Sodas," in which the original post asks in part: "Are Zero sodas (Coke Zero, Sprite Zero, Big Red Zero, etc) still okay to drink?" (RC 184, May 12-14, 2013, www.whattoexpect.com);

16. A blog post on the side effects of soda that refers to "diet or 'zero' sodas," which also mentions Coke, Diet Coke, and Coke Zero (RC 185, Jan. 23, 2012, livewholebefree.com/wordpress); and

17. A blog post on weight loss referencing the impact of "zero sodas" on nutrition (RC 186, Sept. 1, 2012, http://zeudy.com).

Opposition Nos. 91178927 et al.

RC's indirect evidence is competent, for the most part,[28] but insufficient. This handful of public references spread over five years does not establish that ordinary consumers primarily use or understand the term ZERO to refer to the genus of soft drinks, sports drinks, or energy drinks. This is particularly true in the context of the ubiquity of TCCC's ZERO products, which have had billions of dollars in sales since they first entered the market in 2004, as discussed *infra*.

    4.  TCCC's Use of ZERO

Finally, RC argues that TCCC itself uses the term ZERO and numeral "0" generically in nutrition labels, packaging call-outs, and product names. "Moreover, virtually every advertisement for TCCC's ZERO-named products reinforces that 'zero' in the product name refers not to the source of the product but to the zero-calorie nature of the product."[29]

We find TCCC has presented ZERO as part of a mark in product names. *E.g.*:[30]



------

[28] The contents suggest that consumers in at least references 5, 8, 11, and 15-16 are using "Zero" either in whole or in part to refer to the parties' products.

[29] RC Brief at 41, 145 TTABVUE 43.

[30] Exhibit B to Feb. 28, 2007 Response to Office Action, Application Serial No. 78664176, resubmitted by notice of reliance as TCCC Exhibit 207, 110 TTABVUE 152.

Opposition Nos. 91178927 et al.

The remainder of RC's argument pertains more to the descriptive nature of the term ZERO. Although such uses of ZERO and 0 by TCCC certainly convey information about the nature of its products – including primarily that they contain zero (or at least fewer than five) calories – they do not name the genus of those goods.

### C. Conclusion as to Genericness

We have examined the record as a whole, including evidence that we have not specifically discussed, taking into account both the evidence that supports and detracts from a finding of genericness. *See Princeton Vanguard*, 114 USPQ2d at 1834; *see also West Fla. Seafood, Inc. v. Jet Rests., Inc.*, 31 F.3d 1122, 31 USPQ2d 1660, 1663 (Fed. Cir. 1994) (encouraging Board to "look at the evidence as a whole, as if each piece of evidence were part of a puzzle" in assessing prior use). For all of the reasons discussed, we find that RC has not met its burden to establish by a preponderance of the evidence that ZERO is generic for soft drinks, sports drinks, or energy drinks, even such drinks that contain no, or fewer than five, calories.

### VI. Secondary Meaning

We next consider TCCC's claim of acquired distinctiveness in the ZERO marks, which has been challenged before. In *Companhia de Bebidas das Américas – Ambev v. Coca Cola Co.*, Opposition No. 91178953 (parent), 2012 WL 1881492 (May 2, 2012) (non-precedential) ("*Ambev*"),[31] the Board found the record evidence sufficient to

---

[31] Citations are to the slip opinion. A decision of the Board not designated as a precedent is not binding on the Board, but may be cited for whatever persuasive weight to which it may be entitled. TBMP § 101.03. TCCC cites *Ambev* for its persuasive value, noting that the decision "addressed many of the same issues that the Board will need to resolve in these proceedings." TCCC Reply Brief at 10 n.6, 161 TTABVUE 12. We agree with the parties that the decision in *Ambev*, which involved a different opposer, is not binding or preclusive here.

Opposition Nos. 91178927 et al.

support registration on the Principal Register under Section 2(f) of the same 17 applications RC now opposes. Genericness was not an issue in that consolidated proceeding, filed by another competitor of TCCC's in the soft drink field and dismissed with prejudice after trial.

*Ambev* was decided in May 2012, nearly four years before this case came before us for decision. TCCC's subject applications were filed from 2003 to 2008 and, following submission of evidence in support of TCCC's Section 2(f) claims, approved for publication between 2007 and 2009. The question of whether the ZERO marks have acquired distinctiveness, however, is determined on the basis of the facts existing as of the time registrability is being considered by the Board. Accordingly, we will take into account facts arising up to the closing of the testimony periods. So as to be clear, the Board can and must consider all evidence of use, promotion, consumer reaction and the like properly presented up to the close of the opposition's trial phase. *General Foods Corp. v. MGD Partners*, 224 USPQ 479, 486 (TTAB 1984); *see also McCormick & Co. v. Summers*, 354 F.2d 668, 148 USPQ 272, 276 (CCPA 1966) (stating that "registrability of a mark must be determined on the basis of facts as they exist at the time when the issue of registrability is under consideration"); *Harsco Corp. v. Elec. Scis., Inc.*, 9 USPQ2d 1570, 1571 (TTAB 1988).

"To show that a mark has acquired distinctiveness, an applicant must demonstrate that the relevant public understands the primary significance of the mark as identifying the source of a product or service rather than the product or service itself." *In re Steelbuilding.com,* 75 USPQ2d at 1422. Passage of time alone may be insufficient to establish secondary meaning. *See, e.g., In re Packaging*

- 26 -

Opposition Nos. 91178927 et al.

*Specialists, Inc.,* 221 USPQ 917, 920 (TTAB 1984) (deeming use of mark for sixteen years "a substantial period but not necessarily conclusive or persuasive on the Section 2(f) showing"). Trademark Rule 2.41(a)(3), 37 C.F.R. § 2.41(a)(3), states that an applicant may submit, in support of registration under Section 2(f), "appropriate evidence showing duration, extent, and nature of the use in commerce and advertising expenditures in connection therewith . . . and verified statements, letters or statements from the trade or public, or both, or other appropriate evidence of distinctiveness."

A variety of record evidence is directed toward the question of secondary meaning. First, in the application file for the mark COKE ZERO, TCCC identified sales in the two years preceding its 2007 claim of acquired distinctiveness as exceeding $1 billion for its ZERO products, or the equivalent of more than 50 million 288-fluid ounce cases, with more than one-third of total sales attributable to COKE ZERO alone.[32] With respect to advertising, by 2007,

> Applicant states that it has spent in excess of one hundred fifty million dollars ($150,000,000.00) advertising and promoting its ZERO family of beverage products, which includes COKE ZERO, SPRITE ZERO, FANTA ZERO, VAULT ZERO and PIBB ZERO, through a myriad of advertising and promotional channels. Applicant has spent over one hundred million dollars ($100,000,000.00) advertising and promoting COKE ZERO alone.[33]

---

[32] Feb. 28, 2007 Response to Office Action, Application Serial No. 78664176, resubmitted by notice of reliance as TCCC Exhibit 207, 110 TTABVUE 58-59.

[33] *Id.*, 110 TTABVUE 58.

Opposition Nos. 91178927 et al.

Although filed under seal in this case, TCCC submitted evidence that its sales and advertising totals through the end of 2011 were multiples of the preceding figures.[34] These very high dollar amounts, in conjunction with TCCC's other evidence, strongly support a showing of secondary meaning.

Next, TCCC introduced evidence of unsolicited media coverage, both in its application files and in the trial record. This includes, for example, an April 17, 2007 story in THE WALL STREET JOURNAL titled *Zero Is Coke's New Hero*, stating in part that "the company is scoring a surprise hit with Coca-Cola Zero."[35]

Finally, TCCC submitted the testimony deposition of Dr. Alex Simonson, who conducted a survey of secondary meaning in the term ZERO for soft drinks in 2008, with exhibits pertaining to the study. In the survey, Dr. Simonson found that 61% of respondents associated the term ZERO with one company, as opposed to 6% for the term DIET, yielding a net secondary meaning level of 55%; a second type of analysis of the data yielded net secondary meaning of 57%.[36] Moreover, a majority of all 251 respondents – 131, or 52% – mentioned either COKE (or variants thereof) or SPRITE when asked with what company's products they associated the term ZERO.[37]

---

[34] In the *Ambev* decision, we cited non-confidential testimony that "sales of the ZERO line of beverages, including COCA-COLA ZERO, SPRITE ZERO, PIBB ZERO, FANTA ZERO, and other ZERO beverages have increased in the ensuing years to over four billion dollars, with over eight hundred and sixty million cases of COCA-COLA ZERO being sold," *id.* at 17, and that "TCCC's advertising expenditures for its entire line of ZERO [ ] beverages had risen to five hundred and thirty seven million dollars by mid-2010." *Id.* at 18.

[35] TCCC Notice of Reliance, Exhibit 271, 110 TTABVUE 405-09.

[36] Simonson Tr. at 27:7-28:6, 167 TTABVUE 31-32.

[37] TCCC Exhibit 131 ("A Test of Relevant Consumers to Determine the Level of Secondary Meaning of the Term 'Zero' as Part of a Name with Respect to Soft Drinks") at 10, 167 TTABVUE 215.

Opposition Nos. 91178927 et al.

Although RC criticizes the survey, we remain of the view we held when the same survey was submitted in the *Ambev* case: that it "validates the significant sales and advertising numbers" discussed *supra*. *Id.* at 20. *See In re Hehr Mfg. Co.*, 279 F.2d 526, 126 USPQ 381, 382 (CCPA 1960) (finding survey "adequate to show that a majority of those interviewed" associated mark with applicant's products); 6 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION § 32.190 (4th ed. 2016) ("MCCARTHY") ("Generally, figures over 50% are regarded as clearly sufficient.") (footnote omitted). We note, however, that the survey was conducted approximately five years before the close of testimony in early 2014, somewhat diminishing its weight in assessing contemporary public perception. That is not to say it is without probative value in the present proceeding.

RC argues that TCCC cannot establish secondary meaning because its use of ZERO has not been substantially exclusive. The substantially exclusive standard, however, makes allowance for use by others that may be inconsequential or infringing, which does not necessarily invalidate the applicant's claim. *L.D. Kichler Co. v. Davoil, Inc.*, 192 F.3d 1349, 52 USPQ2d 1307, 1309 (Fed. Cir. 1999).

Other than RC's own name DIET RITE PURE ZERO, the record evidence concerning third-party use of ZERO in a mark for soft drinks is inconsequential, particularly when compared with the magnitude of TCCC's use. Sales and advertising for RC's DIET RITE PURE ZERO have been substantial since the product was renamed in the summer of 2005, totaling over $327 million in net revenue from 2007 through 2012, equal to an estimated 1.8 billion cans sold in nearly 25,000 retail

Opposition Nos. 91178927 et al.

outlets throughout the United States.[38] RC spent more than $5 million advertising its product over the same five-year period.[39] Except for one newspaper story, however, there is no record evidence of the public's understanding of the significance of the mark DIET RITE PURE ZERO, or that ZERO in that mark primarily identifies the source of a product.[40] None of the respondents in the 2008 Simonson survey who associated ZERO with only one company also identified DIET RITE PURE ZERO.[41] *See* 2 MCCARTHY § 15:27 ("The quantity and quality of third party use is not alone determinative and must be weighed along with other evidence."). We find that the cumulative effect of TCCC's use of ZERO in connection with its line of soft drinks is so extensive that it qualifies as "substantially exclusive" as required under Section 2(f), and that the use of ZERO by others is not so extensive as to rise to a level that invalidates TCCC's claim of substantially exclusive use.

Considering the record evidence as a whole, we find that TCCC has established by a preponderance of the evidence that it has acquired distinctiveness in the descriptive term ZERO when used as part of a mark for soft drinks and, thereby, for syrups, concentrates, and powders for making soft drinks.

In their secondary meaning arguments, the parties seem to agree that we should decide whether ZERO has acquired distinctiveness for beverages or zero-calorie

---

[38] RC Brief at 14-15, 145 TTABVUE 16-17.

[39] *Id.* at 15, 145 TTABVUE 17.

[40] JEAN SHANLEY, *Organizers do their best to cater to stars' whims*, THE MEADVILLE (PA) TRIBUNE, Aug. 16, 2008, Opposer's Notice of Reliance on Printed Publications, Exhibit RC 190, 101 TTABVUE 362-66 (referencing a rock band's request for "Diet Rite Zero Cola").

[41] Simonson Tr. at 140:13-141:7, 167 TTABVUE 144-45.

Opposition Nos. 91178927 et al.

beverages. Yet virtually all the record evidence of secondary meaning, including the Simonson survey, addresses only soft drinks. This includes the Section 2(f) evidence submitted with TCCC's five subject applications that cover other types of beverages, namely, sports drinks and energy drinks. In the context of the record as a whole, evidence filed under seal shows sales and marketing expenditures for POWERADE ZERO sufficient to satisfy TCCC's burden with respect to sports drinks. We find, however, that TCCC has not met its burden to establish by a preponderance of the evidence that it has acquired distinctiveness in the term ZERO for energy drinks.

For these reasons, RC's opposition is SUSTAINED as to registration of application Serial No. 77413618 (FULL THROTTLE ZERO for "non-alcoholic beverages, namely, energy drinks") without disclaimer of the term ZERO. For applications Serial Nos. 76674382 (COKE ZERO ENERGY), 76674383 (COKE ZERO BOLD), and 78698990 (VAULT ZERO), the Section 2(f) claim is restricted to "non-alcoholic beverages, namely, soft drinks; syrups and concentrates for making soft drinks." RC's oppositions are SUSTAINED as to registration of these three applications without disclaimer of the term ZERO as to the remaining goods: "non-alcoholic beverages, namely, energy drinks" and "syrups and concentrates for making energy drinks." TCCC is allowed two months from the date of this decision in which to file a motion to amend these four applications to conform to the findings of the Board by stating that no claim is made to the exclusive right to use ZERO apart from the marks as shown for the applications and goods "non-alcoholic beverages, namely, energy drinks" and "syrups and concentrates for making energy drinks." *See* Trademark Manual of Examining Procedure (TMEP) § 1212.02(j) (April 2016). Failing that, the

*- 31 -*

Opposition Nos. 91178927 et al.

opposition will be sustained as to applications Serial Nos. 77413618, 76674382, 76674383, and 78698990. *See* Trademark Rule 2.133(b), 37 C.F.R. § 2.133(b).

RC's oppositions are DISMISSED WITH PREJUDICE as to applications Serial Nos. 78316078, 78580598, 78620677, 78664176, 77097644, 77175066, 77175127, 77176099, 77176108, 77176127, 77176279, 77257653, and 77309752.

VII.    Priority

We turn now to TCCC's opposition to RC's applications to register DIET RITE PURE ZERO and PURE ZERO[42] on the grounds of priority and likelihood of confusion pursuant to Trademark Act Section 2(d).[43]

The parties disagree as to the relevant priority dates. RC argues that it can rely for priority on the dates it filed its applications pursuant to Section 1(b) of the Trademark Act. TCCC contends that: "In a proceeding such as this, involving use by both parties of descriptive terms, priority is not determined based on constructive use as of the filing date of a party's intent to use application. Priority in such a case is determined instead by the priority as to secondary meaning."[44]

---

[42] Applications Serial Nos. 78576257 and 78581917 were filed by Royal Crown Company, Inc. Their assignment to Dr Pepper/Seven Up, Inc. ("Dr Pepper") was recorded with the USPTO Assignment Recordation Branch on April 30, 2010, at Reel/Frame 4196/0881. Dr Pepper was joined as a party in each of these consolidated proceedings by Board order of March 15, 2013, 84 TTABVUE.

[43] TCCC also pled a false suggestion of a connection claim under Section 2(a) of the Trademark Act, but noted that it is relying at trial only on its Section 2(d) claim. TCCC Brief at 45 n.18, 153 TTABVUE 47. TCCC therefore waived the Section 2(a) claim. *United Global Media Group, Inc. v. Tseng*, 112 USPQ2d 1039, 1040 n.2 (TTAB 2014).

[44] TCCC Reply Brief at 8, 161 TTABVUE 10.

Opposition Nos. 91178927 et al.

The flaw in TCCC's position is that it must prove a likelihood of confusion between its ZERO family of marks and RC's marks considered in their entireties. Although RC has disclaimed ZERO from each of its applied-for marks, we find that RC's marks DIET RITE PURE ZERO and PURE ZERO are not descriptive in their entirety. Rather, as a whole, the marks are inherently distinctive. *Cf. Larami Corp. v. Talk To Me Programs Inc.*, 36 USPQ2d 1840, 1846 n.9 (TTAB 1995) ("The Board has held that, where ***neither party's mark*** in an Opposition proceeding is inherently distinctive, priority lies with the party whose mark is the first to become distinctive through use in commerce.") (emphasis added) (citing *Perma Ceram Enters. Inc. v. Preco Indus. Ltd.*, 23 USPQ2d 1134 (TTAB 1992)); *Bass Pro Trademarks LLC v. Sportsman's Warehouse Inc.*, 89 USPQ2d 1844, 1851-52 (TTAB 2008) (finding mark SPORTSMAN'S WAREHOUSE, used by both parties in plain or design form, to be merely descriptive, and stating: "Accordingly, with respect to petitioner's pleaded common law use of the mark SPORTSMAN'S WAREHOUSE, the issue of priority is based on the priority of the acquisition of acquired distinctiveness."). RC therefore need not prove priority of secondary meaning in its marks to defeat TCCC's claims, but is entitled to the benefit of its application filing dates: February 28, 2005 for DIET RITE PURE ZERO, and March 7, 2005 for PURE ZERO.

TCCC neither pled nor argued that RC's marks are likely to cause confusion with any of its individual marks, instead focusing on the "Zero Marks" collectively identified in its 17 applications, i.e., its asserted ZERO family. *See, e.g.*, TCCC's Brief at 48: "In view of TCCC's established family of ZERO marks, consumers are likely to believe that RC's ZERO Marks, since they also contain the common ZERO

*- 33 -*

Appx33

Opposition Nos. 91178927 et al.

characteristic, are part of TCCC's family of ZERO marks."[45] To establish ownership and priority in a family of ZERO marks in this opposition proceeding, TCCC must show by competent evidence:

> "first, that prior to the entry into the field of the opponent's mark, the marks containing the claimed 'family' feature or at least a substantial number of them, were used and promoted together by the proponent in such a manner as to create public recognition coupled with an association of common origin predicated on the 'family' feature . . . ."

*Marion Labs. Inc. v. Biochemical/Diagnostics Inc.*, 6 USPQ2d 1215, 1218 (TTAB 1988) (quoting *Land-O-Nod Co. v. Paulison*, 220 USPQ 61, 65-66 (TTAB 1983)).

A family of marks "only arises if the purchasing public recognizes that the common characteristic is indicative of a common origin of the goods." *Han Beauty Inc. v. Alberto-Culver Co.*, 236 F.3d 1333, 57 USPQ2d 1557, 1559 (Fed. Cir. 2001) (quotation omitted). Consistent with our discussion *supra*, establishing a family of marks – a doctrine available only to a plaintiff, *Baroid Drilling Fluids Inc. v. Sun Drilling Prods.*, 24 USPQ2d 1048 (TTAB 1992) – has been compared to acquiring secondary meaning. *See, e.g.*, 3A Louis Altman & Malla Pollack, Callmann on Unfair Competition, Trademarks & Monopolies § 21:47 (4th ed. 2015) ("In effect, to establish the existence of a family relationship the trademark proprietor must meet something like a secondary meaning standard."). As we stated in *Aloe Creme Labs., Inc. v. Aloe 99, Inc.*, 188 USPQ 316, 325 (TTAB 1975):

> It is established that in order to achieve or establish a "family of marks", it must be demonstrated through competent evidence that the various marks asserted to comprise said "family" or, at least, at [sic] goodly number of them, have become familiar or known to a particular segment of the purchasing public as a result of sales or constant exposure through

---

[45] 153 TTABVUE 50.

> advertising and promotion in a manner which creates an association of common ownership and recognition by the inclusion in each mark of the asserted "family" characteristic. See: Witco Chemical Company, Inc. v. Smith, 153 USPQ 412 (TT&A Bd., 1967), *affirmed*, 164 USPQ 43 (CCPA, 1969). The doctrine of a "family of trademarks", as recognized by the court in American Aloe Corporation v. Aloe Creme Laboratories, Inc., supra, is bottomed on a theory basically similar to the concept of "secondary meaning" to the extent that the proponent thereof must show that it has achieved recognition or secondary meaning in the "family" characteristic sufficient to preclude others from using or registering the term as a portion of a trademark for like or similar goods.

*See also* 4 MCCARTHY § 23:61 ("Even if the family 'surname' is descriptive, it may become the basis of a family of marks if secondary meaning is proven.") (footnote omitted).

The only mark in its asserted ZERO family that TCCC used before RC's filing dates was SPRITE ZERO, beginning in September 2004, six months before RC's priority dates.[46] By using only a single ZERO mark before RC's priority dates, TCCC has not established a family of marks indicating a single source of ZERO-formative soft drinks in the minds of the consuming public.

TCCC has failed to establish priority in its asserted family of ZERO marks, an indispensable element of a likelihood of confusion claim. *E.g.*, *Life Zone Inc. v. Middleman Group Inc.*, 87 USPQ2d 1953, 1960 (TTAB 2008). We need not reach the merits of the likelihood of confusion issue because without proof of priority, TCCC cannot prevail.

The claims under Trademark Act Section 2(d) are dismissed.

---

[46] The product introduced in September 2004 actually was called DIET SPRITE ZERO. TCCC did not change to name to SPRITE ZERO until 2006. *See* Baker Tr. at 61:17-62:4, 168 TTABVUE 65-66.

Opposition Nos. 91178927 et al.

**Decision:** RC's opposition is SUSTAINED as to registration of application Serial No. 77413618 (FULL THROTTLE ZERO for "non-alcoholic beverages, namely, energy drinks") without disclaimer of the term ZERO. For applications Serial Nos. 76674382 (COKE ZERO ENERGY), 76674383 (COKE ZERO BOLD), and 78698990 (VAULT ZERO), the 2(f) claim is restricted to "non-alcoholic beverages, namely, soft drinks; syrups and concentrates for making soft drinks." RC's oppositions are SUSTAINED as to registration of these three applications without disclaimer of the term ZERO as to the remaining goods: "non-alcoholic beverages, namely, energy drinks" and "syrups and concentrates for making energy drinks."

TCCC is allowed two months from the date of this decision in which to file a motion to amend these four applications to conform to the findings of the Board, failing which judgment will be entered against it as to applications Serial Nos. 77413618, 76674382, 76674383, and 78698990. *See* Trademark Rule 2.133(b), 37 C.F.R. § 2.133(b).

All other claims asserted by the parties are DISMISSED WITH PREJUDICE.

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on ___November 17, 2016___
by:

     ☐ U.S. Mail

     ☐ Fax

     ☐ Hand

     ☒ Electronic Means (by E-mail or CM/ECF)

___Laura Popp-Rosenberg___    ___/s/ Laura Popp-Rosenberg___

            Name of Counsel                      Signature of Counsel

| | |
|---|---|
| Law Firm | Fross Zelnick Lerhman & Zissu, P.C. |
| Address | 866 United Nations Plaza |
| City, State, Zip | New York, NY  10017 |
| Telephone Number | (212) 813-5900 |
| Fax Number | (212) 813-5901 |
| E-Mail Address | |

NOTE: For attorneys filing documents electronically, the name of the filer under whose log-in and password a document is submitted must be preceded by an "/s/" and typed in the space where the signature would otherwise appear. Graphic and other electronic signatures are discouraged.

Reset Fields

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.   This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e).

☒   This brief contains  [*state the number of*]  10,906  words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), or

☐   This brief uses a monospaced typeface and contains  [*state the number of*] _____ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.   This brief complies with the or typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

☒   This brief has been prepared in a proportionally spaced typeface using

[*state name and version of word processing program* ]  Microsoft Word Office 2013  in

[*state font size and name of type style* ]  14 point font size, Times New Roman type style  , or

☐   This brief has been prepared in a monospaced typeface using

[*state name and version of word processing program* ] _____ with

[*state number of characters per inch and name of type style* ] _____ .

/s/ Laura Popp-Rosenberg
_____
(Signature of Attorney)

Laura Popp-Rosenberg
_____
(Name of Attorney)

Counsel for Appellants
_____
(State whether representing appellant, appellee, etc.)

November 17, 2016
_____
(Date)

[ Reset Fields ]

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE MOTIONS OR BRIEFS CONTAINING MATERIAL SUBJECT TO A PROTECTIVE ORDER

**Motion / Response / Reply** Containing Material Subject to a Protective Order

☐    This motion, response, reply complies with the limitations set forth in Fed. Cir. R. 27(m) and contains [*state the number of*] _____ words (including numbers) marked as confidential, or

☐    This motion, response, reply does not comply with the word count limitations set forth in Fed. Cir. R. 27(m) and a motion requesting permission to exceed the maximum word count limitation is being filed contemporaneously with the filing of this motion, response, or reply.

---

**Briefs** Containing Material Subject to a Protective Order

☑    This brief complies with the limitations set forth in Fed. Cir. R. 28(d) and contains [*state the number of*] _15_____ words (including numbers) marked as confidential, or

☐    This brief does not comply with the word count limitations set forth in Fed. Cir. R. 27(m) and a motion is requesting permission to exceed the maximum word count limitation is being filed contemporaneously with the filing of this brief.

---

/s/ Laura Popp-Rosenberg
_____
(Signature of Attorney)

Laura Popp-Rosenberg
_____
(Name of Attorney)

Counsel for Appellant
_____
(State whether representing appellant, appellee, etc.)

11/17/206
_____
(Date)